NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2204-18T4
A-2219-18T4
A-2276-18T4
A-2278-18T4
A-2283-18T4
A-2288-18T4
A-2292-18T4
A-2305-18T4

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER FOR
PANGAEA HEALTH AND WELLNESS, LLC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER
FOR GGB NEW JERSEY, LLC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER
FOR LIBERTY PLANT SCIENCES, LLC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER
FOR ALTUS NEW JERSEY, LLC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA

| APPROVED FOR PUBLICATION |
| :---: |
| November 25, 2020 |
| APPELLATE DIVISION |

ALTERNATIVE TREATMENT CENTERS
COMPASSIONATE CARE FOUNDATION,
INC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER
FOR ALTUS NEW JERSEY, LLC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER
FOR HARVEST OF NEW JERSEY, LLC.

_____

IN THE MATTER OF THE APPLICATION
FOR MEDICINAL MARIJUANA
ALTERNATIVE TREATMENT CENTER
FOR BLOOM MEDICINALS OF PA, LLC.

_____

> Argued October 20, 2020 – Decided November 25, 2020
>
> Before Judges Fisher, Moynihan and Gummer.
>
> On appeal from a final agency decision of the New Jersey Department of Health, dated December 17, 2018.
>
> John W. Bartlett argued the cause for appellant Pangaea Health and Wellness LLC (Murphy Orlando LLC, attorneys; John W. Bartlett, Jason F. Orlando and Christopher D. Zingaro, on the briefs in A-2204-18).
>
> Joshua S. Bauchner argued the cause for appellant GGB New Jersey, LLC (Ansell Grimm & Aaron, P.C.,

attorneys; Joshua S. Bauchner, of counsel and on the briefs; Rahool Patel, on the briefs in A-2219-18).

Seth R. Tipton argued the cause for appellant Liberty Plant Sciences LLC (Florio Perrucci Steinhardt & Cappelli LLC, attorneys; Seth R. Tipton, of counsel and on the briefs in A-2276-18).

Kevin J. McKeon of the Pennsylvania bar, argued the cause for appellant Altus New Jersey (Hawke McKeon & Sniscak LLP, attorneys; Kevin J. McKeon, Judith D. Cassel and Melissa A. Chapaska, of counsel and on the briefs in A-2278-18 and A-2288-18; Rachel S. Cotrino, of counsel and on the briefs in A-2288-18).

Sean Mack argued the cause for appellant Compassionate Care Foundation, Inc. (Pashman Stein Walder Hayden, PC, attorneys; Sean Mack and Matthew Frisch, on the briefs in A-2283-18).

Maeve E. Cannon argued the cause for appellant Harvest of New Jersey LLC (Stevens & Lee, PC, attorneys; Maeve E. Cannon and Patrick D. Kennedy, of counsel and on the briefs; Wade D. Koenecke, on the briefs in A-2292-18).

Stuart M. Lederman argued the cause for appellant Bloom Medicinals of PA, LLC (Riker Danzig Sherer Hyland & Perretti LLP, attorneys; Stuart M. Lederman, of counsel and on the briefs; Diane N. Hickey, on the briefs in A-2305-18).

Jacqueline R. D'Alessandro, Deputy Attorney General, argued the cause for respondent New Jersey Department of Health (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, on the briefs in all appeals).

Christopher R. Gibson argued the cause for respondent Columbia Care New Jersey, LLC (Archer & Greiner, PC, attorneys; Christopher R. Gibson and Patrick M. Flynn, of counsel and on the briefs in all appeals).

George R. Hirsch argued the cause for respondent MPX New Jersey, LLC (Sills Cummis & Gross, PC, attorneys; George R. Hirsch and Kenneth F. Oettle, of counsel and on the briefs in all appeals).

Eric I. Abraham argued the cause for respondent GTI New Jersey, LLC (Hill Wallack LLP, attorneys; Eric I. Abraham and Henry T. Chou, of counsel and on the briefs in all appeals).

Benjamin Clarke argued the cause for respondent Verano NJ, LLC (DeCotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys; Benjamin Clarke, of counsel and on the briefs in all appeals; Michael DiFazio, on the briefs in all appeals; and join in the brief of respondent New Jersey Department of Health in A-2276-18, A-2283-18, A-2288-18 and A-2292-18).

Robert A. Magnanini argued the cause for respondent JG New Jersey, LLC (Stone & Magnanini, LLP and Frank Newel, (Loevy & Loevy) of the Illinois bar, admitted pro hac vice, attorneys; Robert A. Magnanini and Michael Clore, and Frank Newel, of counsel and on the briefs in A-2278-18, A-2288-18 and A-2292-18; and join in the brief of respondent New Jersey Department of Health in A-2204-18, A-2219-18, A-2276-18, A-2283-18, and A-2305-18).

A. Matthew Boxer argued the cause for respondent NETA NJ, LLC (Lowenstein Sandler, attorneys; A. Matthew Boxer and Steven Llanes, on the briefs in A-2219-18 and A-2305-18; and join in the brief of respondent New Jersey Department of Health in A-

2204-18, A- 2276-18, A-2278-18, A-2283-18, A-2288-18 and A-2292-18).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In these eight appeals, which have been calendared together, appellants contend the Department of Health made numerous errors in its selection of entities to operate Alternative Treatment Centers to grow, process, and dispense marijuana as part of the State's Medicinal Marijuana Program. Appellants Pangaea Health and Wellness LLC, Harvest of New Jersey, LLC, Liberty Plant Sciences LLC, Bloom Medicinals of PA, LLC, GGB New Jersey, LLC, Altus New Jersey, LLC, and Compassionate Care Foundation, Inc. complain about, among other things, the Department's selection process, including the criteria used, the manner in which their applications were scored, and the overall sufficiency and explanation of the final agency decisions. Because we agree with appellants that the scoring system produced arbitrary results that have gone unexplained, we intervene and vacate the final agency decisions in question, and we remand for further proceedings.

I

The Applicable Legislation. The Compassionate Use of Medical Marijuana Act, N.J.S.A. 24:6I-1 to -30, which was enacted on January 18, 2010,

protects qualifying patients and their caregivers from arrest, prosecution, and other penalties in New Jersey for possessing marijuana for medical purposes. N.J.S.A. 24:6I-2(e).[1] To qualify, a patient must suffer from one of the enumerated conditions or from any condition the Department establishes as debilitating. N.J.S.A. 24:6I-3.

The Compassionate Use Act also protects those authorized to produce, process, and dispense marijuana pursuant to the statute's terms, N.J.S.A. 24:6I-7, and charges the Department with implementing the State's Medicinal Marijuana Program (the Program), N.J.S.A. 24:6I-3. See Natural Med., Inc. v. N.J. Dep't of Health and Senior Servs., 428 N.J. Super. 259, 262 (App. Div. 2012). This includes establishing a registry of qualified patients and issuing permits for the operation of Alternative Treatment Centers (ATCs). N.J.S.A. 24:6I-4; N.J.S.A. 24:6I-7.1; Natural Med., 428 N.J. Super. at 262.

N.J.S.A. 24:6I-7(a)(3) tasks the Department with "ensur[ing] the availability of a sufficient number of [ATCs] throughout the State, pursuant to need" and requires that the Department issue permits for "at least two [ATCs]

_____

[1] The Act has undergone significant revisions. See L. 2019, c. 153. Those amendments, however, did not go into effect until July 2, 2019, and have no bearing on our disposition of these appeals about the final agency decisions rendered in December 2018.

each in the northern, central, and southern regions of the State."  Beyond the mandated six ATCs, the Department "has discretion to determine how many ATCs are needed to meet the demand for medicinal marijuana and whether the issuance of a permit to a particular applicant would be consistent with the purposes of the Act."  Natural Med., 428 N.J. Super. at 263.  In ensuring the availability of a sufficient number of ATCs, the Department promulgated regulations, N.J.A.C. 8:64-1.1 to -13.11, which provide the framework through which it issues requests for applications for the operation of ATCs.

In 2011, to fulfill its obligation under N.J.S.A. 24:6I-7(a), the Department issued a request for applications to select entities to operate the State's first six ATCs.  In re Inst. for Health Rsch. and Abunda Life Ctr., No. A-0069-11 (App. Div. Aug. 22, 2013) (slip op. at 1-2).  A five-member reviewing committee consisting of three Department members, one member from the Department of Agriculture, and one from the Department of Community Affairs, evaluated thirty-five applications and awarded scores for each criterion.  Id. at 2-3.  At that time the Department decided that no applicant could hold more than one ATC permit and that two ATCs could not be opened in the same municipality, concluding this standard would promote accessibility to more patients and the

availability of more diverse products.  <u>Id.</u> at 3-4.  The reviewing committee chose two different high-scoring applicants for each of the three regions.  <u>Ibid.</u>

After the Department rendered decisions announcing the entities it had chosen to proceed with the ATC permitting process, several disappointed applicants appealed.  <u>Id.</u> at 1.  We concluded that the Department's proceedings were not arbitrary, capricious, or unreasonable.  <u>Id.</u> at 7-9.

In January 2018, the Governor issued Executive Order 6, which directed the Department to review the Program's status with a mind toward expanding access to medical marijuana.  A few months later, the Department added new conditions to the list of those qualifying for the Program, including certain types of chronic pain, Tourette's syndrome, migraines, and anxiety.  These additions caused a rapid increase in qualified and registered patients between March and July 2018.

<u>The Request for Applications</u>.  In July 2018, to ensure that the growing population of qualified patients would be adequately served, the Department issued a second request for applications for the selection of six more entities, two in each region, to receive ATC permits.

The request for applications had two sections.  Part A required information about:

- the applicant's corporate form;

- proposed locations for grow sites and dispensaries and whether these locations complied with all local codes and ordinances;

- names of all managers, staff, contractors, vendors, landlords, and suppliers;

- whether the applicant held any medical marijuana-related licenses in other states; and

- disclosures of any regulatory violations, litigation, and criminal histories.

Part A was evaluated on a pass/fail basis; the application would be rejected if the applicant failed to respond sufficiently to each question.

Part B consisted of sixty scored criteria requiring applicants to provide narrative responses and to attach responsive documents. The criteria covered several topics, asking applicants about their experience, expertise, and plans to operate an ATC in New Jersey if selected, including but not limited to:

- cultivation policies and procedures and knowledge of botany and chemistry related to the growing and processing of marijuana products;

- mobilization plans and time estimates for producing first crops;

9

- past business experience with medical marijuana, if any;

- quality assurance and quality control plans;

- plans for insect and disease control and sanitation;

- plans to assist scientific research;

- security plans;

- proposed facility floor plans;

- financial records, records of past taxes paid, and proposed budgets; and

- workplace and ownership diversity and collective bargaining agreements.

The request for applications informed prospective applicants that responses to Part B would be evaluated by a review committee on a 1000-point scale; the request listed the maximum points that could be earned for each criterion. The total scores awarded to an applicant by the review committee would then be averaged, creating the applicant's final composite score. The request for applications also clarified that winning applicants would not be issued permits immediately; they would instead be "chosen to proceed in the permitting process."

10

On August 9, 2018, the Department held a mandatory pre-submission conference for applicants to explain the scoring process. It also responded in writing to questions from prospective applicants in an official "Q&A" document made publicly available less than a week later.

By the application closing date of August 31, 2018, the Department received 146 applications from 103 entities, with several entities applying in more than one region. For example, Altus applied in the central and southern regions, Bloom in all three, and Liberty in the northern and southern regions. Three appellants applied in only a single region: GGB in the northern region; Harvest in the southern region; and Pangaea in the central region.

The review committee. The Department chose a six-member committee to review and score all applications; this review committee was comprised of four representatives from the Department, one from the Department of Agriculture, and one from the Department of Treasury. On September 5, 2018, before the scoring process began, the review committee members attended a workshop, which included a discussion about the Program, guidance on scoring applications, and training on diversity and bias. Each review committee member completed disclosure forms and signed certifications stating that neither they

nor any members of their immediate family had any financial or personal ties to any applicant.

The Department provided the review committee members additional printed scoring instructions for the sixty criteria. For each criterion, the instructions directed members to award points on a scale from zero to a maximum number of points allowable, which varied. The instructions also stated that scores of zero should be reserved for "non-responsive" answers.

Review committee members were initially given sixty days from the application due date to complete their evaluations, but, when committee members expressed concerns about this allotted time, the Department extended the review period for six weeks. At times, members emailed questions to the Department about how to score some of the criteria, to which the Department responded.

On December 12, 2018, the review committee recommended six applications per region for "further consideration." Five days later, the Department issued final agency decisions to all applicants, expressing its acceptance or rejection of their applications. Included with these collective decisions was the Department's explanation that, as with the previous round of ATC permitting, it would not award more than one permit to any single

applicant, even if that applicant was one of the two highest scorers in more than one region. The Department believed that choosing six different entities would benefit patients because it would lead to a greater variety of products and would ensure that if one entity suffered a setback like a crop failure, only one ATC would be affected.

After identifying the region with the greatest need for medical marijuana, the Department chose two applicants for that region first. The Department explained, in its final agency decisions, that it had ordered the regions by greatest supply and demand by considering the

> total population of the region divided by total statewide population . . . and, utilizing the Department's Medical Marijuana Patient Registry, the current medical marijuana patient population in the region divided by total statewide medical marijuana patient population. The two calculations were averaged to determine the demand factor. The Department calculated a medical marijuana supply factor using data extracted from the inventory management systems of the current ATCs. The supply factor was the total current medical marijuana supply of the region in ounces divided by total statewide supply in ounces.

The Department then divided the two factors to determine the ratio of supply to demand for each region, with lower numbers expressing the need for greater supply to meet the care requirements of Program patients. In this way, the

Department ranked the regions according to need in this order: northern, southern, and central.

Once the applications were scored, the Department ascertained the region-by-region top scorers. For the northern region, the Department chose the two highest scoring applicants: NETA NJ, LLC, with 932.1667 points, and GTI New Jersey, LLC, with 927.3333 points.[2] For the southern region, MPX and NETA scored highest, with 958.1667 and 932.1667 points, respectively, but because NETA had already been selected for the northern region, the Department chose MPX and Columbia Care New Jersey, LLC, which came in third with 929 points. In the central region, MPX, NETA, Columbia, and GTI scored highest, but all were bypassed because their applications were top finishers in other regions. As a result, the next two highest-scoring applicants were chosen: Verano, with 920.8883 points, and JG New Jersey, LLC, with 913.3333 points.

The final agency decisions. Accepting those scores without further apparent scrutiny, and without allowing disappointed applicants any means to question or challenge their scores or the scores of those that were approved, the

---

[2] Appended to this opinion is a list of the top two scorers and others that finished close behind in each region.

A-2204-18T4

Department rendered final agency decisions. In its brief four-page decisions, the Department:

- recounted how the Department called for and received applications;

- described the review committee's formation but in no greater detail than we have explained here;

- stated that it first reviewed applications for completeness;

- identified the top six finishers in each region along with their composite scores;

- explained why it chose the top two finishers in first the northern and then the central and southern regions and provided a brief explanation for why there was an increased demand in that order;

- declared its bottom-line ruling on the application;

- informed applicants of the time within which an appeal could be filed; and

- mentioned that the fees provided by unsuccessful applicants would be returned.

A-2204-18T4

The final agency decisions did not explain whether or to what extent the Department may have reviewed or verified the scores rendered by the review committee.

The filing of appeals and attempts to expand the record. Following the final agency decisions, several unsuccessful applicants – including some of these appellants – submitted requests to the Department under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1.1 to -13, for copies of the winning applications, score sheets, and other related documents. The Department responded by creating an online library of materials, including redacted versions of successful applications. None of the appellants challenged the Department's response.

Pangaea, Harvest, Liberty, Bloom, GGB, Altus,[3] and Compassionate Care appeal the Department's final agency decisions. Motions for stays pending appeal were denied at the Department level, as well as in this court and the Supreme Court.

Pangaea, Liberty, and Bloom also unsuccessfully moved in this court for leave to supplement the record with expert reports in the field of statistical

---

[3] Altus has filed two appeals, separately challenging the unfavorable final agency decisions rendered on its central and southern region applications.

mathematics. The Supreme Court denied Pangaea's motion for leave to appeal the denial of its motion to supplement. In re Application for Med. Marijuana Alt. Treatment Ctr., 240 N.J. 385 (2020).

II

Because appellants' many arguments are either similar or overlap, we heard the appeals together. We now decide these eight appeals by way of this single opinion.

Our response to many of the issues posed by appellants is informed by our view of the legitimate questions posed by appellants as to the scores assigned by the Department. In short, all roads lead to the same point: numerous, indisputable anomalies in the scoring of the appellants' applications prevent us from having sufficient confidence in the process adopted by the Department or its results for the approval of ATCs in this important industry that provides "beneficial use[s] for . . . treating or alleviating the pain or other symptoms associated with" certain medical conditions. N.J.S.A. 24:6I-2(a). It is for this chief reason that we remand to the Department to undertake further steps to ameliorate these concerns.

To explain our disposition of these appeals, we consider and first discuss appellants' arguments about scoring because our view of those issues impacts

most of the remaining issues. Accordingly, we analyze in the following order: (a) appellants' arguments about scoring; (b) the standard of appellate review; (c) the sufficiency of the record on appeal; (d) the lack of an intermediate step between the results achieved by the review committee and the issuance of final agency decisions; (e) the sufficiency of the Department's findings; (f) a handful of discrete issues; and (g) the remedy that we believe is necessary to instill public confidence in the Department's procedures and the results it achieved.

A

We first consider appellants' specific arguments about the scoring and their contention that, because the Department tolerated too great a degree of "relative error" in its scoring, its decisions were arbitrary, capricious and unreasonable. This argument, with which we agree, is demonstrated by numerous examples that simply cannot be rationally explained on the record before us.

As mentioned, the review committee consisted of six members who were required to provide a score on a given range – a range that started at zero and finished at various numbers depending on the particular criterion. The scores of each six members were then averaged to produce the applicant's final score on each criterion. The Department argues that by averaging the scores of six

diverse members, a fair and reasonable assessment of an applicant's score on each criterion would be obtained. But appellants argue, and we agree, that any averaging only slightly ameliorates anomalies and tends to produce inaccurate scores. They argue that there is such a large degree of "relative error" in some of the criteria that no one – not this court, not the applicants, and not the public – can have confidence in the final results.

In considering this relative-error concept, we emphasize that we are not suggesting that either the Administrative Procedure Act or the legislation in question somehow incorporates the world of statistics, cf. Lochner v. New York, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting and observing that "[t]he Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics"), but we do suggest they require the application of common sense and strive to suggest a more accurate process than that which seems to have been adopted here.

Moreover, in expressing concern for the relative error of some of the examples provided by appellants, we do not mean to suggest that an agency engaging in a similar process may not tolerate an occasional error or mistake without running the risk of being labelled arbitrary or capricious. To the contrary, we expect that an administrative process may lead to imperfect

19

conclusions because the participants and the public expect speed and efficiency at that level.  See, e.g., Texter v. Dep't of Hum. Servs., 88 N.J. 376, 385 (1982) (recognizing that administrative agencies necessarily "possess the ability to be flexible and responsive to changing conditions").  Nevertheless, the concept of relative error – in the face of the Department's failure to offer appellants a platform for arguing that the review committee made mistakes that ought to be examined and corrected – is an appropriate means for examining why, if left unexamined, uncorrected, or unexplained, the results of the Department's process must be viewed as arbitrary, capricious, and unreasonable.

Relative error is a concept that simply measures the extent to which a computation may be mistaken.  It can range from a relative error of zero percent (everyone agrees) to 100% (one judge gives the lowest possible score and another gives the highest possible score).  The higher the relative error, the greater the doubt about the accuracy of the score derived from averaging the scores.  Stated another way, when six individuals consider the same criterion – assuming the examiners use the same observational tools and share the same understanding about how to score what they see – one would expect that these individuals would produce the same or quite similar scores, meaning the relative error would be close to zero.  So, any system that produces an extensive variety

of scores calls into question the accuracy or legitimacy of its results. For example, if four baseball umpires watch the same play – a fly out to centerfield – anarchy would soon follow if only one umpire said he saw a fly out to centerfield, while the other three claimed to have seen: the batter swing and miss; a groundout to shortstop; and a pop-out to the catcher. The two competing teams – and spectators that tuned in to watch – would rightfully find the judging system deeply flawed even if the "average" of those four calls amounted to an out. That approach would soon lead to chaos and cast grave doubt on the accuracy of the game's final score. The many scoring examples provided by appellants similarly lead us to question whether the Department has enacted a system that's producing non-arbitrary results that the Legislature intended in its enactment of the Compassionate Use Act and that the participants and the public have a right to expect.

Pangaea asserts that in eight of the sixty Part B scoring categories – thirteen percent of the overall test – it received in the same category perfect scores as well as zeroes. That is, in thirteen percent of the overall test, the review committee's assessment was based on a 100% relative error factor; with the committee giving scores that consisted of an average of both perfect scores and perfectly bad scores.

Three categories sought the applicant's floor plans or interior renderings for the proposed ATC's cultivation, manufacturing, and dispensary sites, and noted that "[n]o explanation is necessary"; these categories were scored on a range of zero to fifteen, with zero being assessed only as to applicants who had failed to provide the requested plan or rendering. Pangaea provided floor plans, yet one reviewer gave scores of zero, five, and zero on these three categories. Because Pangaea provided plans, one might expect perfect scores across the board, but with the unexplained low scores, and their inclusion in the calculus that produced the average for each of these categories, Pangaea's score was brought down considerably from what one would expect in light of the fact that the remainder of the group viewed Pangaea's response as near perfect.[4] Even if the Department's response was correct that Pangaea's floor plans were provided elsewhere in its application, and thus it was reasonable for a low score to be assigned, one can only wonder about the reasonableness of the other perfect scores.

---

[4] Pangaea makes the further point that these scores are all the more surprising because some applicants – who secured higher scores – did not actually have a site for these facilities, but merely promised a particular type of facility in a specific location. Pangaea had actually leased property in Ewing and provided 108 pages of architectural and engineering site plans in its application.

Other Pangaea scores revealed similar anomalies. Noteworthy is the proliferation of zeroes despite instructions given by the Department to the review committee that a zero should only be assigned when the applicant's answer was non-responsive.[5] Additional inconsistency can be found in a snapshot of some of the other numbers on Pangaea's scorecard:

- 10  25  16  23  0  25

- 15  15  15  15  0  15

- 20  0  23  25  18  25

- 20  25  20  25  0  25

- 15  0  15  15  0  0

The zeroes are disconcerting, particularly when other review committee members awarded high or perfect scores when considering the same information on the same criterion. On this record, one can only wonder what it was that the review committee members on either side of this spectrum were or weren't seeing or considering when assessing Pangaea's application.[6]

---

[5] The review committee members were instructed that "[a] score of 0 should only be used when [the applicant's answer was] non-responsive to the measure or criterion, unless otherwise indicated."

[6] Some of the appellants argue this may not all be the fault of the review committee members, suggesting they were simply asked to do far too much in

A-2204-18T4

Liberty Plant raises similar questions about its scores. On one category – knowledge of botany, horticulture, and phytochemistry and the application of those sciences to the cultivation of medical marijuana – Liberty Plant observes that it received two perfect scores of thirty, a near perfect twenty-nine, a very high twenty-five, but then two scores of fifteen. The relative error of the scoring here was fifty percent. On another category – inventory management – the relative error was seventy percent, with review committee members giving a perfect twenty, a near-perfect nineteen, three above-average scores (a sixteen and two fifteens), and a sub-par six.

---

too short a period of time. To illustrate this claim of "reviewer fatigue," GGB asserts that each review committee member was charged with reviewing more than 100 applications consisting of more than 53,000 pages in a span of eleven weeks or, stated another way, each member was required to evaluate more than 4800 pages per week (975 pages per day, excluding weekends and holidays). GGB argues that each reviewer was essentially "tasked with reading [the 1225-page novel, War and Peace] nearly four times in a single week." In response, it has been argued that this allegation of "reviewer fatigue," even if true, does not necessarily mean that the review committee ended up scoring appellants too low; it is just as likely that it could have led to scoring them too high. But that only supports another argument that we will later discuss: that without an explanation for the inconsistent scores, no one can know for sure whether they were produced by "reviewer fatigue," a misunderstanding of the criteria, or the worth of the applicant's responses. Without an explanation from the Department, one can only speculate why inconsistent scores were so frequently rendered.

A-2204-18T4

Consideration of the applicant's past history of paying business taxes was judged on a scale of zero to twenty-five. The scores received by Liberty Plant had a relative error of ninety-six percent because it was awarded: twenty-four, twenty, three fifteens, and a zero. Altus received similar discrepant scores: twenty-four, twenty-three, fifteen, five, and two zeroes. Bloom's experience was not much different, receiving: two twenty-fives, a twenty-four, a fifteen, and two zeroes. Harvest received three twenty-fives, a twenty, an eighteen, and a zero.

In five categories, the scoring for Liberty Plant revealed a relative error of 100% despite the production of considerable information responsive to the question. In one of these categories – calling for certified financial statements, including a balance sheet, income statement, and a statement of cash flow – Liberty Plant received two perfect twenty-fives, a twenty, a ten, and two zeroes. Harvest received two twenty-fives, two twenties, an eighteen, and a zero. Altus received a wide array of scores: twenty-five, twenty-three, fifteen, ten, five, and zero. Not one of the six review committee members had the same view of Altus's response as any other member.

Liberty Plant's response to a category about collective bargaining agreements was awarded two perfect tens, two eights, and two zeroes. On this

category, Harvest received two tens, a nine, a seven, and two zeroes.  Similarly disturbing in its variety of scores from perfect to non-responsive, was the confusion about a category that sought information about whether the applicant was women-owned, minority-owned, or veteran-owned.  Altus received: twenty-three, twenty, ten, and three zeroes.  Bloom received two perfect twenty-fives, an eighteen, two fifteens, and a zero.  And Harvest, which asserted that its majority owner is an African-American woman, inexplicably received only one twenty-five, as well as a fifteen, a ten, and three zeroes.[7]

Another criterion that provide inconsistent scores was one that sought the applicant's plans to dedicate funding or other resources for research.  Liberty Plant received four perfect tens and two zeroes.[8]

GGB had a similar experience but describes it in different terms that similarly persuade us there's simply something wrong with the scoring:

---

[7]  The confusion may arise – but ought to have been explained in the final agency decisions – from the fact that some applicants had applied for but had not by that time received certifications about minority ownership.

[8]  To add to the scoring anomalies on this category, Liberty Plant refers us to the fact that in its identical submission in another geographic region, it received five perfect tens and one eight.  This means that the two reviewers who assigned the same answer a zero in one region gave Liberty Plant a ten or eight when judging the same response for purposes of another region; put in statistical terms the same reviewers on the same applicant's identical answer had relative error of either 80 or 100%.

A-2204-18T4

[O]ne reviewer awarded GGB a total of 625 points whereas two other reviewers awarded it in excess of 900 points, a difference of more than 300 points. In other words, if these individual scores were placed on a traditional secondary school grading scale (0-100) by dividing the individual scores by 10, GGB received the equivalent of an "F" from one reviewer and an "A" from two others. More astonishingly, the delta between the lowest individual score (625) and the second-lowest individual score (782) is 157 points whereas the delta between the second-lowest individual score and the highest individual score (938) is slightly lower at 156 points.

GGB does not limit its concerns to its own situation but points out that almost half of the 146 applicants had composite average scores that varied by more than 300 points between the highest and the lowest and, for a handful of applicants, the composite average score varied by more than 600 points, an extraordinary discrepancy when considering that the total amount of points available on an application was 1000.[9]

Bloom's approach is similar. Bloom argues that one reviewer consistently gave it much lower scores on all categories than the other reviewers, noting that, collectively, five reviewers gave it scores of 912, 920, 942, 981, and 989, while

---

[9]  GGB also provided detail about the discrepancies between reviewers on various categories like those that we already discussed with regard to Pangaea and Liberty Plant. For brevity's sake we do not specifically mention those categories in which, like other appellants, GGB received both perfect scores and zeroes.

the sixth gave it only a 625, and that when this anomaly is averaged with the other consistent scores, its average was pulled down and its final score finished out of the money.

The Department has done little to justify these anomalies or explain why they should be disregarded. We would characterize the Department's contentions as falling into two general assertions: (1) the divergent scores in some instances are the product of "each member appl[ying] his or her unique expertise to the scoring process," and (2) all applicants were subject to the same process and, therefore, all buoyed or dragged down by the varying scores. The former is unconvincing because it runs counter to the fact that the Department provided each review committee member the same set of instructions that it presumably sought to have applied in the same way, as well as the rather obvious likelihood that the Department did not intend – nor should it have intended – to allow reviewers' personal views to enter into the calculus. We are also unpersuaded by the Department's false-equivalency argument. It is certainly true that the winning and losing applicants were subjected to the same review committee, and there may be evidence of similar inconsistent scoring of the

winning applications,[10] but that doesn't mean that they were entirely treated the same way.

The Department also asserts that it ameliorated the consequences of an occasional outlying score by taking the average of all the scores of the six review committee members. To be sure, averaging will naturally reduce the impact of an outlier on the overall scores, but not so much when there are multiple outlying scores. Take, for example, one set of marks received by Pangaea that included three perfect fifteens and three zeroes. After the committee averaged those numbers, Pangaea received an average score of seven-and-one-half, a score that has no kinship with a single vote that Pangaea received.[11]

---

[10] For example, of the scores of all successful applicants on the women-, minority-, or veteran-owned business criterion, some were relatively consistent but others weren't:

| Columbia Care | 2 | 0 | 0 | 22 | 0 | 25 |
| GTI | 15 | 20 | 15 | 24 | 0 | 0 |
| JG | 10 | 0 | 0 | 23 | 0 | 0 |
| MPX | 25 | 25 | 25 | 23 | 25 | 25 |
| NETA | 20 | 25 | 15 | 23 | 25 | 25 |
| Verano | 25 | 25 | 25 | 24 | 25 | 25 |

[11] GGB and Bloom both argue that the Department could have avoided these types of anomalies – or at least reduced their detrimental impact on the accuracy of the review committee's work – by "censoring"; that is, by removing some of the data to produce a more reasoned result. Bloom suggests the Department should have eliminated the scores of one review committee member who

A-2204-18T4

There is no escaping the fact that some of these scores simply "don't compute" and that, no matter how the Department and the other respondents may attempt to slice it, the results are still unsettling.[12]

B

Having expressed our views about scoring, we turn to the parties' arguments about the standard of appellate review. As observed earlier, this is one of those issues influenced by our view of the scoring.

---

repeatedly gave Bloom lower scores than the other members. GGB appears to suggest removing particular outlying scores. Due to many factors, including bias, the scoring method in some sporting events – particularly during the Cold War – called for the removal of the highest and lowest scores and averaging the rest, thereby reducing the degree of relative error and rendering the score more accurate. The simplicity of that approach is appealing but it won't result in sufficient adjustments with some scores, such as where Pangaea received three perfect fifteens and three zeroes; the average remains the same even if one high and one low score are eliminated. In any event, if such adjustments are to be made, it is for the Department to make them. Our role extends to determining whether the Department's processes are or are not arbitrary, capricious, or unreasonable; we will not intervene to the point of imposing a better system or determining what a better system would be.

[12] The Department and other respondents argue that we have already given approval of a similar selection method when reviewing final agency decisions rendered in 2011. See In re Inst. for Health Rsch., No. A-0069-11 (App. Div. Aug. 22, 2013). We need not recount the differences between the arguments posed in that case and those presented here. It suffices to observe that our decision in that case was not published and has no precedential impact or interest. R. 1:36-3. We have referred to this unpublished opinion elsewhere in this opinion only for historical-background purposes.

A-2204-18T4

Bloom, GGB, Liberty, and Pangaea argue that we need not afford any deference to the Department's evaluation process, the scores, or the ultimate selection of winning applicants. They claim the Department lacks specialized knowledge in the area of medical marijuana, lacks expertise because it has conducted only one prior request-for-application process related to ATC permits, and because, as Bloom puts it, the review committee members were "representative[s] of different State agencies and largely evaluated matters outside the scope of their individual skills and expertise." Because our view of the scoring issues requires a remand even if we were to apply the most deferential standard of review, we find it necessary to add only a few comments on this issue.

As a general matter, the judicial capacity to review agency actions is "limited." Pub. Serv. Elec. and Gas Co. v. N.J. Dep't of Env't Prot., 101 N.J. 95, 103 (1985). An agency's "final quasi-judicial decision" should be affirmed unless there is a "clear showing" that it is "arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007). In examining a challenge to a final agency decision, we are generally limited to determining whether the agency action violates "express or implied legislative policies," whether the decision is supported by "substantial evidence

31

in the record," and whether, "in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors." Pub. Serv. Elec. and Gas, 101 N.J. at 103. An appellate court's "strong inclination" must be to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. and Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). This inclination is strong "when the agency has delegated discretion to determine the technical and special procedures to accomplish its task," In re Application of Holy Name Hosp. for a Certificate of Need, 301 N.J. Super. 282, 295 (App. Div. 1997) – as the Department claims here – and should be "construed liberally when the agency is concerned with the protection of the health and welfare of the public," Barone v. Dep't of Hum. Servs., 210 N.J. Super. 276, 285 (App. Div. 1986). But, "[t]he interest of justice" is always a valid invitation for intervention, and a reviewing court is free "to abandon its traditional deference . . . when an agency's decision is manifestly mistaken." Outland v. Bd. of Trs. of the Teachers' Pension and Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999).

In short, when we defer, we defer because of an agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding

role." Messick v. Bd. of Review, 420 N.J. Super 321, 325 (App. Div. 2011). This rationale, however, "is only as compelling as is the expertise of the agency, and this generally only in technical matters which lie within its special competence." In re Boardwalk Regency Corp., 180 N.J. Super. 324, 333 (App. Div. 1981). See, e.g., Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988) (deferring to Division on Civil Rights' expertise in recognizing acts of discrimination, but not to its findings on an employee's diagnosis of alcoholism, which it was "no better able to evaluate . . . than is a reviewing court"); Cooley's Anemia & Blood Rsch. Found. for Child., Inc. v. Legalized Games of Chance Control Comm'n, 78 N.J. Super. 128, 140 (App. Div. 1963) (recognizing that courts "generally defer to the special expertness and broad experience of an administrative agency in its general field, but not in the same degree in all cases[;] [i]t depends upon the issues . . .").

As we have already observed, the Department established a review committee consisting of members purportedly possessing the Department's own expertise, as well as members of other disciplines, since it included a member from the Department of Agriculture and one from the Department of Treasury.[13]

---

[13] We see no reason to question this approach. The Legislature charged the Department with the task of ascertaining the best applicants, and we find nothing

Yet, each member was required to vote on all criteria, meaning that the Agriculture member was called upon to assess applicants' financial capacities, while the Treasury member was required to appraise applicants' horticultural capabilities. Despite this cross-over into areas not likely within a member's bailiwick,[14] each member's vote was equally weighed; in other words, the Agriculture member's vote on financial matters possessed the same value as the Treasury member's vote on that same subject.

We do not know who the review committee members were, nor do we even know what their backgrounds might have suggested about the caliber of their opinions concerning matters beyond what their Department affiliation might suggest. Accordingly, it is unclear on this record the extent to which we should defer to the scores rendered by the review committee and adopted by the Department.

_____

arbitrary, capricious, or unreasonable in the Department's fulfillment of that obligation in creating a multi-member review committee by enlisting representatives from other departments, including the Departments of Agriculture and Treasury. We are satisfied that the Department acted in accordance with the legislative mandate in taking this approach. We question – but do not now decide in light of the remand we mandate today – whether the votes should have been weighted whenever a member voted on a matter outside the member's expertise or, if the Department chooses not to weight such votes, whether a score left un-skewed is entitled to deference.

[14] The record contains nothing about the alleged expertise or background of any member because the Department has kept their identities confidential.

A-2204-18T4

The Department must address the numerous questions posed about its scoring procedures and explain the basis for its resolution of the remand proceedings before we can ever adequately review whatever final agency decisions come from those proceedings. So, we need not reach any definitive conclusion about the standard of appellate review applicable here. We would urge the Department, however, to make findings that take into consideration our concerns.

We commend to the Department the standard expressed by our Supreme Court sixty years ago. Even then, the Court recognized that this standard was nothing new; instead, the Court stated that it was already then "axiomatic in this State" that

> an administrative agency acting quasi-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations.
>
> [Application of Howard Sav. Inst. of Newark, 32 N.J. 29, 52 (1960); see also In re Issuance of Permit by Dep't of Env't Prot., 120 N.J. 164, 172 (1990).]

Whether the Department's process may be labelled quasi-judicial is beside the point. The Department clearly relied in its final agency decisions on the values assigned by its review committee and the mathematical results that those values yielded; it claims those are its findings. In justifying the reasonableness of its determinations, the Department refers to its processes but without explaining away the questions patently arising from them. The Department's final agency decisions provide only a net opinion by giving us nothing more than the computations made from the raw data lacking the "why and wherefore" of the decisions rendered. Cf. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (recognizing that an expert renders an inadmissible net opinion when failing to provide "the why and wherefore" that supports the opinion). Instead, the Department – by issuing final agency decisions without first allowing disappointed applicants an opportunity to challenge the findings at the agency level – has left it to us to hear those arguments for the first time while simultaneously arguing that we must defer to its findings and conclusions on issues it has not yet had the opportunity to hear. To ensure the production of a final agency decision worthy of deference, the Department must find a way to listen to and resolve questions from the disappointed applicants, and then

explain its resolution of those complaints before expecting our endorsement of the results.

C

Compassionate Care argues that the record on appeal is insufficient to provide a basis for review because the Department did not release the applications of the selected applicants without "heavy" redactions. GGB makes the same argument, and further complains that the Department redacted the names of the six review committee members, making it "impossible" for applicants to "ascertain whether any of the reviewers held [any] bias[es]." Liberty Plant makes similar arguments.

By way of background on this point, we initially observe that the request for applications advised that applications would be "generally subject to public release pursuant to [OPRA] and/or [sic] the common law," but that "proprietary and other types of information contained in the applications may be exempt from public disclosure," and an applicant could designate "specific information" that it felt should be exempt from disclosure. The request for applications explained that if the Department withheld a designated part of an application when responding to an OPRA request, and the requester posed a challenge, the

A-2204-18T4

applicant might be required to intervene and defend its assertion that the information was exempt from disclosure.

The Department also informed prospective applicants at the mandatory pre-application conference of their ability to designate portions of their submissions as "confidential, trade secrets, proprietary, commercial or financial information, or information which, if disclosed, would give a competitive advantage or disadvantage." The Q&A document stated that any disclosure of information by the Department would be "consistent with [OPRA's] requirements" and that applicants would need to submit a memo delineating those portions of their applications they felt were confidential, proprietary, or otherwise exempt from disclosure if they wanted such portions redacted in responses to OPRA requests. The names of the review committee members were also redacted in the Department's response to OPRA requests.

In their submissions to this court, appellants have not provided full versions of every successful application, even with redactions. GGB and Liberty Plant, the appellants who have asserted that the Department should have released the winners' materials without redactions, included only portions of their own applications in their appendices: GGB submitted its entire application

but with very significant redactions and many blacked out passages; Liberty Plant submitted just four pages of its application.

In considering these arguments about the sufficiency of the record on appeal, we first recognize that appellants were given notice of the possibility that if they filed an OPRA request asking for any other entities' applications, they might receive redacted versions. The request for applications afforded every applicant the opportunity to ask the Department to withhold specific portions of its application. Some applicants, including those chosen to proceed with the permitting process, apparently requested significant redactions of their submissions. The Department honored the terms of its request for applications and should not now be put in the position of dishonoring that understanding because of the happenstance of these appeals. In fact, N.J.A.C. 8:64-6.4 states that the record in an appeal from a final agency decision in this context "shall be" the applications at issue with attached supporting documents "excluding information deemed exempt pursuant to [OPRA]."

Second, N.J.S.A. 47:1A-6 provides that a person who is denied access to a record by its custodian may "institute a proceeding to challenge the custodian's decision by filing an action in Superior Court . . . ; or . . . file a complaint with the General Records Council established pursuant to [N.J.S.A. 47:1A-7]."

Appellants did not avail themselves of either of these avenues to address their dissatisfaction with the redactions in the documents they received in response to their OPRA requests. Had they done so, the chosen tribunal could have decided whether the winning applications or the names of the review committee members were exempt from disclosure under OPRA.

Third, even if the current appeals were an appropriate forum to address appellants' arguments, OPRA permitted the Department to withhold the information it had redacted. N.J.S.A. 47:1A-1.1 states that the definition of "government record" does not include: "trade secrets and proprietary commercial or financial information obtained from any source"; "emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein"; "security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software"; or "information which, if disclosed, would give an advantage to competitors or bidders."

The request for applications required applicants to submit several types of highly technical and scientific information about their marijuana strains, growing methods, pest-control methods, manufacturing procedures, and

available products. It also sought information about applicants' proposed site layouts, security measures, and financial information. While we can only hypothesize about the likely outcome, it seems reasonable to assume that any redacted portions contained information exempt from disclosure under OPRA. That GGB and Liberty Plant submitted heavily redacted or reduced versions of their own bids into the record on appeal suggests they view this information as proprietary and are unwilling to reveal to their competitors or the public the technical details of their operations. For the same reason, the argument that such information from others should have been included in the record on appeal is without merit.

In short, we must recognize that we are hampered by the record's limitations in our ability to assess whether the final agency decisions were arbitrary, capricious, reasonable, or unsupported by the record. Had – among other possible approaches – the Department conducted a brief internal review process after inviting those disappointed by the results to express their objections or questions and after allowing respondents an opportunity to respond to those exceptions – the Department could have pinpointed the areas of controversy and explained for us its view of the exceptions filed. That way, once an appeal was filed, we could have better appreciated the need for a record

41

containing those materials – whether still redacted or submitted confidentially – that would assist our determination of whether the final agency decisions were arbitrary, capricious, unreasonable, or unsupported by the record.

So, while we draw no specific conclusion about appellants' arguments on this point, in remanding we leave the matter for the Department's further consideration with the hope that it will appreciate the difficulties we face in reviewing a final agency decision absent a full and understandable record.

We would add, however, that we see no merit in the argument that the Department was obligated to reveal the identities of the review committee members. N.J.S.A. 47:1A-1.1 exempts "inter-agency or intra-agency advisory, consultative, or deliberative material" from disclosure under OPRA. This deliberative process privilege "permits the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 83 (2000). Upholding this privilege is "necessary to ensure free and uninhibited communication within governmental agencies so that the best possible decisions can be reached." Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 286 (2009). In this regard, the Supreme Court observed that

[f]ree and open comments on the advantages and disadvantages of a proposed course of governmental management would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act.

[Id. at 286 (quoting Kaiser Aluminum & Chem. Corp. v. United States, 157 F. Supp. 939, 945-46 (Ct. Cl. 1958)).]

Knowing that their identities could ultimately be revealed could have an impact on review committee members. Moreover, advance revelation of their identities could lead to mischief; applicants could use that knowledge to attempt to lobby or influence members. And even if we assume that these public officials would be beyond such influence, the mere potential of such lobbying could have the effect of diminishing public confidence in the committee's performance.

We, thus, respond to the arguments about the content of the record by referring them to the Department for further consideration in light of what we have said. But we do reject on its merits the argument that the Department was required to divulge the identities of the review committee members.

D

Bloom argues that the Department improperly failed to provide any agency-level procedure for unsuccessful applicants to protest the Department's rejection of their applications and selection of the six winners. GGB, Liberty Plant, and Pangaea make the same argument. Harvest similarly argues that the absence of an agency hearing "violat[ed] longstanding tenets of New Jersey administrative law" and deprived disappointed applicants of a chance to "address errors or otherwise present law and facts challenging [the Department's] decisions."

We agree that the Department was required to do more than compile and tabulate the votes and declare winners based on that raw computation. As appellants have demonstrated, and as we discussed earlier, there are many scores that are patently discordant. Capable review committee members, armed with the same instructions, should not produce such inconsistent results. Red flags should have gone up in instances where, for example, two reviewers gave perfect scores, two reviewers gave middling scores, and two reviewers gave zeroes or, for that matter, anytime that a zero was scored on a criterion on which other reviewers gave high scores. N.J.S.A. 24:6I-7(e) imposed on the Department to "verify" its results, and we believe that charge required more than just checking

its arithmetic. The very nature of the undertaking required not just accurate computations but a search for odd or outlying scores that could unfairly skew the results. We have already demonstrated how in many instances the "relative error" in judging a criterion was too high to be acceptable, whatever the undertaking. And, beyond the Department's bald assertion that it engaged in quality control,[15] there is no evidence of that in the record on appeal. We believe that the statutory obligation that the Department "verify" its results obligated the Department to invoke procedures that would allow parties to question their scores and obtain an explanation before the rendering of final agency decisions.

Some appellants have argued they were entitled to a full-blown hearing that would require the calling of witnesses and cross-examination. We're not so sure. It may be enough that the Department allow a brief period of time for disappointed applicants to assert what they believe are problems with the scores they and others received, allow for responses from successful applicants, and then engage in both an examination of those complaints and an explanation of

---

[15] In the review committee's recommendation report to the Department, it is asserted – without further explanation – that scoring was completed on December 10, 2018, and that the scoring "was subjected to a quality control review, which was completed on Wednesday, December 12, 2018." Absent is any evidence that the review committee or the Department attempted to harmonize the scoring discrepancies or to explain why those scores are not inconsistent or questionable.

how those complaints were resolved or rejected. A further analysis and verification of the winning applicants may not require an evidentiary hearing, but we leave to the Department in the first instance to determine the best way of going about its statutory obligation to verify its results.

In the final analysis, we conclude that by failing to engage in such an additional process, the Department has essentially left it for us to field – in the first instance – appellants' objections to the scoring and to determine whether there is something wrong with the results without receiving from the Department an adequate explanation for why the scores aren't wrong or – in legal terms – aren't arbitrary, capricious or unreasonable. We do not think the Legislature intended for this court to be the clearing house for any problems in the process, or to determine the mathematical reasonableness of the results obtained through the process devised by the Department. In deferring to the idea that it is the Department that should decide who are the winners and losers, we decline the invitation to be the Department's quality-control committee.

In fact, in deferring to the idea that it is the executive branch, not the judicial branch, that must make the ultimate decision as to who should move on in the permitting stage, we will not dictate to the Department what it is that it should do following today's remand, other than to hold that it must engage in

some sort of additional process for receiving and considering the appellants' contentions and must explain its determinations on those contentions. We will not decide or impose on the Department whether it should conduct a plenary hearing, whether it should create a quality control committee to hear, consider, and make recommendations about appellants' concerns, or whether it should devise some other system for resolving appellants' complaints. We hold only that in the absence of some procedure for ensuring and verifying the reviewing committee's conclusions, the results previously produced and adopted in the final agency decisions must be deemed arbitrary, capricious, unreasonable, and untethered to the record, and cannot, therefore, be sustained at this time.

So, in this spirit, we conclude that appellants are correct that they were not afforded the process due under the applicable legislation and the Administrative Procedure Act, and we remand so the Department may provide that process. We intervene in the administrative proceedings that have taken place so far to ensure the public's confidence in both the results achieved at the agency level so far and to ensure that future similar proceedings will be likewise subjected to a measure of scrutiny at the agency level that will guarantee the process does not produce determinations that are arbitrary, capricious or unreasonable. We so hold not because it betters our ability to review the agency

decisions but because of the overriding public interest. As we have said before in bidding matters,[16] "[b]oth the public interest and the public's perception" that the process is "fair, competitive and trustworthy are critical components and objectives." Muirfield Constr. Co. v. Essex Cty. Improvement Auth., 336 N.J. Super. 126, 137-38 (App. Div. 2000).

E

For the same reasons, it follows that the final agency decisions do not contain the type of findings sufficient to command appellate deference. As noted earlier, the final agency decisions in question outline the manner in which the Department went about its task and then set forth the raw scores that culminated in a rejection of appellants' applications. Those decisions present little more than sets of numbers that declare the appellants placed out of the money. Appellants argue that those sets of numbers inadequately express the decisions rendered. We agree.

As is well-established, if an administrative agency's findings are "supported by substantial credible evidence in the record as a whole," a

---

[16] There are many similarities in the Department's manner of finding worthy entities to move on in the permitting stage to the way in which public bidding is conducted. We do not, however, need now to decide whether our approach in reviewing bidding matters is applicable in all respects here.

reviewing court "must accept them." Outland, 326 N.J. Super. at 400. But, an agency's discretion "must be exercised in a manner that will facilitate judicial review." R & R Mktg., LLC v. Brown-Forman Corp., 158 N.J. 170, 178 (1999). As a result, when "acting quasi-judicially," the agency "must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination." Howard Sav. Inst. of Newark, 32 N.J. at 52. This practice allows a reviewing court to "readily determine[]" whether the agency's decision is "sufficiently and soundly grounded or derives from arbitrary, capricious or extralegal considerations." Ibid.

In short, administrative agencies must "articulate the standards and principles that govern their discretionary decisions in as much detail as possible." Van Holten Grp. v. Elizabethtown Water Co., 121 N.J. 48, 67 (1990) (quoting Crema v. Dep't of Env't Prot., 94 N.J. 286, 301 (1983)). And they must make findings "to the extent required by statute or regulation, and provide notice of those [findings] to all interested parties." In re Issuance of a Permit, 120 N.J. at 173. If "the absence of particular findings hinders or detracts from effective appellate review," a matter may be remanded to an administrative agency "for a clearer statement of findings and later reconsideration." In re Vey, 124 N.J. 534, 544 (1991). See, e.g., Green v. State Health Benefits Comm'n, 373 N.J. Super

408, 416 (App. Div. 2004) (reversing and remanding where agency decision contained only "bald assertion" that certain care was not covered under insurance plan); Lambertville Water Co. v. N.J. Bd. of Pub. Util. Comm'rs, 153 N.J. Super. 24, 29 (App. Div. 1977) (remanding where agency decision was "devoid of any analysis" explaining choice and use of formula for calculations). A court may also remand a matter "[w]here the agency record is insufficient," so that it may be "fully develop[ed]." ACLU of N.J. v. Hendricks, 233 N.J. 181, 201 (2018).

In expressing our agreement with those appellants that have argued the final agency decisions do not contain sufficient findings or the expression of an adequate rationale for the conclusions reached, we again observe that the absence of any explanation for those scores that seem – on the present record – at least in part inexplicable demands that we remand for further proceedings. To be sure, "[a]ll of the evidential data" before an agency "need not be repeated or even summarized, nor need every contention be exhaustively treated." Howard Sav. Inst. of Newark, 32 N.J. at 53. But an agency decision must reveal enough of the agency's thought process so that a reviewing court may determine "without question or doubt what facts and factors led to the ultimate conclusions reached." Ibid. We have traditionally striven to accept an agency's findings

even when they "are not nearly so clear, full and well organized" as they could be, but, in the final analysis, we must be able to "understand fully the meaning of the decision and the reasons for it." Ibid.

We have been given numerous reasons to doubt the sufficiency of the final scores that led to the decisions under review. As noted, these final agency decisions were the product of the scoring instructions given to the review committee members. They were directed to "[e]valuate each application and assign a score up to the maximum point value for each measure," then "tally [those] scores on the paper copy" of the application. The instructions then directed the members to "provide a short[,] written description to justify the assigned score." The review committee's recommendation report did not include any descriptions of individual reviewers' scores, the final agency decisions distributed to applicants did not refer to any, and the Department's OPRA response did not include any documents like those described in the instructions.

The final agency decisions provide only the scores resulting from the work of the review committee. We do not have any evidence that the Department ensured that the members understood or followed instructions, and there is no evidence that the scores were either verified in some manner or whether

51

anomalies, which are revealed even in the limited record before us, have been harmonized in some reasonable, non-arbitrary way.

F

Appellants have raised some discrete issues that should not go unmentioned but, because we remand, will for the most part be left to the Department to consider further and provide an explanation for its disposition of these arguments:

> (1) mainly Bloom, but others as well, argue some of the criterion are "vague and subjective" and confused applicants about what was being sought;
>
> (2) Bloom, GGB, Liberty Plant, and Pangaea argue in various ways that some of the Department's criteria were based on regulations that had been proposed but not adopted by the time the request for applications was issued;
>
> (3) Harvest argues that the Department acted improperly by deciding – after applications were submitted – to limit applicants for approval to one ATC permit;
>
> (4) Compassionate Care argues that the Department's selection of MPX to proceed with the permitting process for an ATC in Atlantic City should be overturned because the Department did not take into consideration Compassionate Care's intention to open a satellite location in the same city;
>
> (5) GGB argues that Verano engaged in misconduct that should have precluded its selection; and

52

(6) Bloom's contention that the approval of NETA's application improperly authorized its operation of "a facility within 1,000 feet of a school zone."

As for those contentions we leave undecided here, we will endeavor to be brief because the Department should consider them during the remand proceedings.

First, we agree with appellants about the importance of a "common standard of competition," Twp. of Hillside v. Sternin, 25 N.J. 317, 323 (1957), and, for that reason, the request for applications should be "as definite, precise and full as practicable in view of the character" of the undertaking, James Petrozello Co. v. Twp. of Chatham, 75 N.J. Super. 173, 178 (App. Div. 1962) (quoting Waszen v. Atlantic City, 137 N.J.L. 535, 537 (Sup. Ct. 1948)). We don't agree that the inclusion of subjective criterion necessarily runs counter to that goal. In revisiting these applications and appellants' arguments about the process, the Department should entertain appellants' arguments and provide an explanation for any criterion so criticized in the remand proceedings to follow.

Second, some appellants argue that this court should intervene because the Department used criteria that were either unadopted by regulation or inconsistent with existing regulations. Bloom argues that the Department improperly waived the requirement in N.J.A.C. 8:64-6.2(a)(2) that ATC operators be involved with an acute care hospital without engaging in formal

rulemaking, particularly when considering that the Department informed applicants that its evaluation of applications would be based on its then-current 2011 regulations. Despite those representations, the Department – according to Bloom – improperly based several other criteria on new regulations proposed in 2018 that had not been adopted by that time in accordance with the Administrative Procedures Act. For example, Bloom asserts that criteria seeking financial information from applicants "had no basis" in the 2011 regulations and that the injection of criteria discussed in as-yet-unadopted regulations deprived applicants of "notice of the standard to which they were to be held." GGB and Liberty Plant make the same arguments. Pangaea makes the same arguments as well, while adding an argument that "[t]he development of a scoring system may itself be considered a rule-making."

The Department informed prospective applicants at its pre-submission conference that it had proposed changes to the medicinal marijuana regulations in 2018 but that the public comment period was not over and the changes had not been officially adopted. As a result, the Department declared that "applicants [were] subject to the regulations currently in effect" at the time of submission, meaning the 2011 regulations; this was reiterated in the Q&A document. The Department also stated during the conference that it was waiving

54

the requirement in N.J.A.C. 8:64-6.2 that a permit holder have "documented involvement [with] an acute care hospital," explaining that the Department had found this to be "somewhat impracticable" and advising that the formal repeal of this requirement had been proposed in the new regulations. At the pre-scoring meeting, the review committee was also told to evaluate applications in accordance with the original 2011 regulations.

N.J.S.A. 52:14B-4 mandates that prior to the adoption of a regulation, an agency must give at least thirty days' notice of its intended action and provide "an opportunity for all interested persons to submit data, views, or arguments in writing or orally." George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 18 (1994). Any proposed agency rule that "revises, rescinds or replaces" an existing rule is considered a "new rule" subject to these provisions. N.J.S.A. 52:14B-4.9. Once a regulation is in effect, it has "the force and effect of statutory law," and an administrative agency "ordinarily . . . may not disregard [it]." Van Note-Harvey Assocs., P.C. v. N.J. Sch. Dev. Auth., 407 N.J. Super. 643, 650 (App. Div. 2009).

While an administrative agency's actions must not exceed the powers conferred to it by the Legislature, "the breadth of an agency's authority encompasses all express and implied powers necessary to fulfill the legislative

scheme that the agency has been entrusted to administer." In re Application of Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422-23 (2008). Thus, agencies are "allowed some leeway to permit them to fulfill their assigned responsibilities." Id. at 423.

Notwithstanding, due process requires that substantive procedural standards control agency discretion. Crema, 94 N.J. at 301. The regulated community reasonably expects "that known and uniform rules, standards, interpretations, advice and statements of policy" will be applied by state agencies. Cath. Fam. & Cmty. Servs. v. State-Operated Sch. Dist. of Paterson, 412 N.J. Super. 426, 442 (App. Div. 2010). An agency also may not use its power to interpret its regulations as a means of amending them or adopting new ones. Venuti v. Cape May Cty. Constr. Bd. of Appeals, 231 N.J. Super 546, 554 (App. Div. 1989). Overall, when an agency's action "could not have been fairly anticipated or addressed" because neither the enabling statute nor applicable regulations provided for it, the action is not a proper exercise of discretion. Crema, 94 N.J. at 302.

When the Department issued its 2018 request for applications, N.J.A.C. 8:64-6.2(a) provided that a committee would evaluate applications for ATC permits "on the following general criteria":

1. Submission of mandatory organizational information;

2. Documented involvement of a New Jersey acute care general hospital in the ATC's organization;

3. Ability to meet overall health needs of qualified patients and safety of the public;

4. Community support and participation; and

5. Ability to provide appropriate research data.

[See 50 N.J.R. 1398(a).]

The new version of this regulation, which became effective on May 20, 2019, removed the requirement of an acute care hospital's involvement and added new criteria to be evaluated: "experience in cultivating, processing, or dispensing marijuana in compliance with government-regulated marijuana programs"; "history of compliance with regulations and policies governing government-regulated marijuana programs"; "ability and experience of the applicant in ensuring adequate supply of marijuana"; and "workforce and job creation plan, including plan to involve women, minorities, and military veterans in ATC ownership and management and experience with collective bargaining in the cannabis and other industries." N.J.A.C. 8:64-6.2(a).

In proceeding on the basis of anticipated changes in its regulatory scheme, the Department did not necessarily act arbitrarily, capriciously, and

unreasonably. N.J.A.C. 8:64-7.11, which was effective at the time of the request for applications, provides that the Department "may waive a requirement regarding the operations of [an] ATC" if it determines that it "is necessary to achieve the purpose of the [Compassionate Use] Act and provide access to patients who would otherwise qualify for the use of medicinal marijuana . . . and does not create a danger to the public health, safety or welfare."  The Department informed prospective applicants in advance of the submission date that it was waiving the requirement that applicants be involved with an acute care hospital before this requirement was formally removed by the 2019 update to the regulations because it was "impracticable."  We reject the argument that this was improper in light of the Department's power to waive such an obligation under N.J.A.C. 8:64-7.11; indeed, the waiver increased the pool of possible applicants and may have raised the quality of the pool as well.  Because applicants were advised of this in advance, the waiver was fair and treated all applicants equally.

We also reject the argument that the Department improperly considered elements of pending regulations.  When the request for applications was issued, the Compassionate Use Act did not set forth any particular standards under

which the Department was required to evaluate applications.[17]  Instead, N.J.S.A. 24:6I-7(b) stated that the Department must require that an applicant "provide such information as [it] determines to be necessary pursuant to regulations adopted pursuant to [the Compassionate Use Act]."  The Department had set forth some mandatory evaluation criteria in N.J.A.C. 8:64-6.2, but N.J.A.C. 8:64-6.1(b)(1) more generally provides that the Department must give notice of "eligibility criteria and a statement of the general criteria by which [it] shall evaluate applications."

We agree that, as a general matter, the Compassionate Use Act afforded the Department considerable discretion in selecting applications.  It did not "shackle" the Department to a set of specific standards but instead allowed it the "ability to be flexible and responsive to changing conditions."  Natural Med., 428 N.J. Super. at 271 (quoting Texter, 88 N.J. at 385).  Because all prospective applicants were fully informed of the criteria in the request for applications, at the pre-application conference, and in the Q&A document, the criteria were "fairly anticipated" by the regulated community.  Crema, 94 N.J. at 302.

---

[17]  N.J.S.A. 24:6I-7.2(c), (d), and (e), effective as of July 2, 2019, set forth in detail many criteria the Department must now evaluate when reviewing applications for cannabis cultivator, manufacturer, and dispensary permits.

A-2204-18T4

We further reject Pangaea's argument that the Department's scoring system could be considered "rulemaking" subject to the requirements of the Administrative Procedure Act. "Not every action of an agency, including informal action, need . . . be subject to the formal notice and comment requirements." In re Dep't of Ins.'s Ord. Nos. A89-119 and A90-125 and the Adoption of N.J.A.C. 11:3-16A, 129 N.J. 365, 382 (1992).

Third, Harvest argues that the Department acted improperly when it decided, after applications were submitted, that vendors could be approved for only one ATC permit and that it should have included its method for ranking the three regions of the state in the request for applications instead of waiting until applications were submitted. Harvest goes so far as to say this action "[left] the award process subject to . . . [the] possibility of partiality and fraud" because applicants that did not have the best scores in a region could be chosen, while applicants with higher scores could be passed over because they had already been chosen elsewhere, raising the possibility that reviewers could "steer[]" awards toward "favored vendors."

We reject this contention because the process was similar to that utilized in the first round of ATC permitting in 2011. In its final agency decisions in that prior proceeding, the Department explained that it had decided not to allow

any applicant to hold more than one permit; the fact that in this second round the Department informed applicants after the fact that they would be limited to one permit each was hardly surprising. The Department also explained its reasoning: a more diverse pool of ATC operators would limit the effects of one operator's crop failures or other difficulties on the Program as a whole. This rationale is not arbitrary, capricious, or unreasonable. The timing is a little more troublesome – the Department waiting until after applications were submitted – but there is nothing in the record to suggest that Harvest or other applicants would have decided to apply in more or fewer regions if they had known they could hold only one permit.[18]

Fourth, Compassionate Care argues that the Department's selection of MPX to proceed with the permitting process for an ATC in Atlantic City should be invalidated because the Department improperly failed to evaluate whether applicants' proposed ATC locations would promote "geographic diversity" and "how the location[s] . . . will increase patient access across the state," which Compassionate Care argues it was "required to do."

---

[18]  In fact, all other things being equal, had applicants been allowed to hold multiple permits, only three entities would have been chosen to proceed with permitting: MPX and NETA in the central and southern regions, and GTI and NETA in the northern region.

A-2204-18T4

Compassionate Care, one of the six entities selected in the first round of ATC permitting in 2011, operates an ATC in Egg Harbor Township. In April 2018, the Department invited the original six ATC owners to submit applications to waive the prohibition on satellite locations in N.J.A.C. 8:64-7.9, so they could open dispensaries in additional places. Later that same month, Compassionate Care applied for "satellite waivers" for three dispensaries, one in Atlantic City and two in Camden County.[19]

In September 2018, Compassionate Care submitted a street address for its proposed location in Atlantic City and was quickly advised by the Department that it could pursue the permitting process for an Atlantic City dispensary. The following month, Compassionate Care told the Department it was "reconsidering its satellite locations and was looking at other potential sites."

Through the proceedings now in question, the Department selected for the southern region MPX, which planned to locate its dispensary in Atlantic City. When ruling on Compassionate Care's motion for a stay pending appeal on this issue, the Department stated that it did not consider "the potential locations of theoretical satellite dispensaries," not only characterizing that information as

---

[19] In May 2018, Compassionate Care advised the Department that it was no longer pursuing one of the Camden County locations but was looking into a location in Burlington County.

"speculative," but also finding that Compassionate Care's "conduct and discussions with the Department over the [previous] several months" showed a "lack of commitment to opening a satellite location in Atlantic City." Specifically, the Department referred to several pieces of information and documents Compassionate Care had not provided regarding its plan to operate the satellite dispensary. It declared that considering Compassionate Care's or any other existing ATC permittee's proposed satellite location when selecting applicants under the 2018 request for applications would have been inappropriate because it would have allowed "maneuvering" by such permittees to limit their future competition's location options. We find no merit in Compassionate Care's argument.

N.J.S.A. 24:6I-7(a)(3)[20] states that there must be "at least two [ATCs] each in the northern, central, and southern regions of the State." Nothing else in the Act or the regulations DOH has promulgated pursuant to N.J.S.A. 24:6I-16 refers to the specific location of ATCs. It is true that the result of the 2011 request for applications led to the Department choosing Foundation Harmony, the applicant with the highest score that had not yet been chosen in another

---

[20]   In the version of N.J.S.A. 24:6I-7 in effect during the administrative proceedings in question, L. 2013, c. 160, the same language was employed at subsection -7(a).

region, as the first northern region winner. Because both Foundation Harmony and the next-highest scorer had proposed to locate their ATCs in Secaucus, the Department bypassed the second-place finisher and chose the next entity in line, explaining: "Taking into account the need for geographic diversity to improve patient access . . . [t]he Department does not believe that locating two ATCs in the same municipality to serve the seven-county [n]orthern region is in the best interest of the public." Inst. for Health Rsch., slip op. at 4. Compassionate Care argues that the Department has departed from this view by allowing an entity to operate in Atlantic City near where Compassionate Care has contemplated opening a satellite facility and has instead adopted a new view that geographic diversity may frustrate the purpose of the ATC Program.

In rejecting Compassionate Care's argument, we need not consider whether what was once deemed by the Department as important in 2011 precludes a different view in 2018 or after. The fact is that the Department did not choose an applicant to operate an ATC in a municipality where another existed. MPX will be the first ATC in Atlantic City, which will further the Compassionate Use Act's mandate that the Department ensure a sufficient number of ATCs to serve the needs of eligible patients. When MPX was selected, Compassionate Care had not been issued a permit for a dispensary in

Atlantic City, and the record suggests that it was far from committed to opening a satellite facility there. It was not arbitrary or capricious of the Department to fail to consider the hypothetical possibility that Compassionate Care might pursue an interest in Atlantic City. Indeed, consideration of noncommittal plans by one ATC to open a satellite office in another location could have had the very undue affect of impeding worthy applicants. We find nothing arbitrary or capricious in the Department's approach on this discrete issue.

Fifth, GGB argues that Verano engaged in "highly unethical" or even "criminal conduct" in formulating its application and, therefore, should not have been selected to go forward with permitting in the central region. GGB specifically alludes to the fact that Verano's application revealed that it entered into "host community agreements" (HCAs) with Elizabeth and Rahway, where it intended to locate its dispensary and cultivation site, as part of its efforts to demonstrate the community support required by the request for applications. GGB claims these HCAs were unethical because they provided that if Verano was selected it would make contributions to these municipalities. GGB would have these donations characterized as "bribes" to the municipalities in exchange for written letters of support that Verano could use in its application.

Among other things, the request for applications asked applicants to provide "written verification of the approval of the community or governing body of the municipality in which the [ATC] is or will be located" and for the applicants to "describe their ties to the local community and history of community involvement," including but not limited to involvement with local non-profits and community organizations, business and investment ties, and local hiring plans. At the pre-application conference, the Department explained that it was "looking for some form of documentation that the municipal government [was] in favor of an [ATC] operating in that jurisdiction and [would] not . . . interfere and impede the [permitting] process."

Verano's HCAs with Elizabeth and Rahway state that in the event Verano's application was successful and it completed the permitting process to operate its dispensary in Elizabeth and its cultivation center in Rahway, it would make immediate "contributions" to those cities and further contributions at the end of every year it was in business. Verano also agreed to give priority to local businesses to provide services like plumbing and waste removal to its facilities, to hire local employees whenever possible, and to participate in "community cleanup/rehabilitation initiatives," and Elizabeth and Rahway agreed to work

with Verano to advise it regarding "research, community benefits, and employee training programs."

The HCAs, however, also stated that Elizabeth and Rahway were "under no obligation" to use Verano's contributions "in any particular manner," but that they would use them "in accordance to prior conversations and agreements." They also explained that by accepting Verano's "donations," the municipalities made "no representation or promise that [they would] act on any license or permit request in any particular way other than by [their] normal and regular course of conduct and in accordance with their rules and regulations and any statutory guidelines." Verano also included an Elizabeth resolution in its application that stated the mayor and council believed Elizabeth would benefit from the location of an ATC within its borders, "subject to compliance with terms and conditions to be agreed upon, provision of an agreed upon host community benefit fee, and compliance with all applicable City Ordinances, Permits and Approvals."

Other applicants included materials in their applications related to agreements made with municipalities. For example, JG submitted a letter from Ewing Township in which the mayor expressed support for its application and stated that JG had shown a "commitment to invest in Ewing" and "collaborate

67

with the Township."  JG's application also included a "Letter of Intent for Host Community Agreement with Ewing Township," which is completely redacted in the record.  Pangaea entered into a "memorandum of understanding" with Ewing Township in which it promised to "provide financial assistance" to the municipality for purposes of rehabilitating and upgrading local parks and recreational facilities in exchange for Ewing offering "support and assistance to Pangaea in securing facilities and necessary approvals" in the town to operate its ATC.  Ewing issued letters stating its approval of Pangaea's intent to locate its operations in the town and passed a municipal resolution to that effect.

It is not readily apparent to us that there is something wrong or unethical about the HCAs in question.  Indeed, such agreements are actually required in a similar Massachusetts program.  Massachusetts requires applicants for medical marijuana permits to negotiate HCAs with municipalities where they propose to locate. 935 Mass. Code Regs. 500.101(1)(a)(8) – (2019).  An HCA "may include a community impact fee for the host community," provided that the fee is "reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment."  Mass. Gen. Laws ch. 94G, § 3(d) – (2017).  Although the Compassionate Use Act does not contain those requirements, and New Jersey need not model its methods after Massachusetts's, it is worth noting

that another state has found HCAs valuable to the expansion of its program, rather than rejecting them as unfair tactics by permit applicants.

More importantly, the question posed by GGB has not yet been addressed by the Department in explaining the reasons for granting and denying the applications submitted under the 2018 request for applications. We think that GGB's assertion – assuming it has any bearing on its own application[21] – should be in the first instance taken up in the Department, and we do not foreclose its consideration in the remand proceedings that will follow today's decision.

Sixth, Bloom has argued – in a footnote in its appeal brief – that NETA should not have had its application approved because it was seeking to operate a facility within 1000 feet of a school zone. Other than that bald assertion and NETA's equally bald denial – calling Bloom's allegation "unfair and untrue" – we have little more in the record to consider whether this argument has merit. As we have for some of these other issues, we will leave this for further consideration in the remand proceedings.

---

[21] We are unsure of the relevance of GGB's opposition to Verano's accepted application since GGB applied in the northern region and was not in competition with Verano in the central region.

G

The parties have also offered different views about potential remedies or how the status quo should be altered or remain unchanged if – as we have now determined – a remand is required. Some contend that we should vacate the final agency decisions in question and remand for more fulsome proceedings in the Department. Others argue we should grant them approval in their chosen region or remand for rescoring. For example, Harvest argues – in relying on our bidding decision in Van Note-Harvey, 407 N.J. Super. at 651 – that we should simply "direct [the Department] to add Harvest to its list of approved applicants." Harvest argues that if its application had been properly scored, it would have been awarded one of the six top spots and that the equitable result is not to deprive one of the successful applicants of its award but to simply add Harvest to the list. One respondent – Verano – while seeking to vindicate the final agency decisions also expresses some support for application of the remedy imposed in Van Note-Harvey, arguing that "if the [c]ourt is inclined to grant any relief at all, it should be relief that expands the roster of licensed ATC operators, not relief that continues and prolongs the current bottleneck situation, which is contrary to the Legislature's declared policy of compassion." Verano's position

is that, whatever we do, we should not upset the progress made by the successful applicants to date:

> The worst thing that could happen from these appeals, and the one thing that should not be allowed to happen, is to backslide or regress.  The six selected applicants should be allowed to move forward with their planned operations, even if the [c]ourt finds Pangaea or any of the other applicants to be entitled to some relief.

There is some appeal in that argument, considering the long delays in implementing the Compassionate Use Act.

Granting appellants relief in the form of awarding them additional positions without depriving the successful applicants of their positions may be tempting, but it is too facile a result even when considering that voters just approved the legalization of recreational marijuana use[22] that will likely generate an increased need for permits.  But we think it is not our place to alter the amount of permits that may issue; such questions reside with the Legislature and whatever direction given by the Legislature to the Department.

---

[22] New Jersey voters were given the opportunity to answer the following question:  "Do you approve amending the Constitution to legalize a controlled form of marijuana called 'cannabis'?"  At the polls on November 3, 2020, two-thirds of the voters said yes.  See Tracey Tully, Recreational Marijuana Legalized by New Jersey Voters, N.Y. Times (Nov. 3, 2020), https://www.nytimes.com/2020/11/03/nyregion/nj-marijuana-legalization.html (last visited Nov. 12, 2020).

Van Note-Harvey is a narrowly-defined decision in inapposite circumstances. There, the Schools Development Authority requested proposals for site consultants for school construction projects for a three-year period. Id. at 646. In ranking the applicants, the Authority took steps that we found were inconsistent with applicable regulations; those steps caused Van Note to fall in the rankings, ultimately depriving it of eligibility. Id. at 648. After finding the Authority had failed to properly apply its regulations, we considered the appropriate remedy and concluded "the fairest outcome" was to "expand" the Authority's list of eligible consultants to include Van Note. Id. at 651. Importantly, unlike what some appellants argue here, we did not override the agency's determination as to the number of eligible consultants that would be permitted. Instead, we noted that when the request for proposals was issued, a determination had not been made as to "the final number of site consultants to be selected," only an "estimate[] that up to nine firms might be chosen." Id. at 646. After we compelled the addition of Van Note, the list of eligible consultants was increased to eight and, so, did "not expand the list of eligible contractors beyond the number that had originally [been] contemplated." Id. at 651.

Appellants argue that we should take a similar approach here, but that would require us to disregard the Department's decision to limit licensing to six entities – two in each region. As we have emphasized throughout this opinion, our power to intervene is limited; to put it simply, we may determine only whether the agency proceedings and the results obtained were arbitrary, capricious, or unreasonable. We have no license to increase the number of successful applicants beyond six as the means for moving these proceedings more quickly to the next step. In fact, it is far from clear that any further proceedings will move any appellant into the top six. We are too far in the dark to approve or reject the final agency decisions, so how could we possibly conclude that some of these unsuccessful applicants should be permitted to move forward in the process?

Beyond remanding for further proceedings, we decline to impose any of the interim relief sought by appellants and otherwise leave the status quo undisturbed. We do not, however, preclude the Department from rendering relief to the appellants pending – or in place[23] – of its fulfillment of our mandate.

---

[23] That is, we see no reason why the Department could not grant Van Note-Harvey-type relief to appellants rather than engage in the remand proceedings that we believe are otherwise required. We simply conclude that it is beyond our jurisdiction to impose that relief.

For all these reasons, we have considerable concerns about the Department's processes and the results produced that – without further agency proceedings and explanation – would leave us to conclude that the decisions in question are arbitrary, capricious and unreasonable. We therefore vacate the final agency decisions in question and remand for further administrative proceedings in conformity with the spirit of this opinion. All requests for interim relief are denied without prejudice to the completion of any further proceedings, which we assume will occur expeditiously.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

* * *

## Appendix

Northern Region

| | |
|---|---|
| *NETA NJ, LLC | 932.17 |
| *GTI New Jersey, LLC | 927.33 |
| Bloom Medicinals of PA, LLC | 894.83 |
| Liberty Plant Sciences, LLC | 894.67 |
| GGB New Jersey, LLC | 823.67 |

Southern Region

| | |
|---|---|
| *MPX New Jersey[24] | 958.17 |
| #NETA NJ, LLC | 932.17 |
| *Columbia Care New Jersey, LLC | 929 |
| Harvest of New Jersey, LLC | 911.17 |
| Altus New Jersey, LLC | 901.67 |
| Liberty Plant Sciences, LLC | 897.17 |
| Bloom Medicinals of PA, LLC | 894.83 |

Central Region

| | |
|---|---|
| #MPX New Jersey | 958.17 |
| #NETA NJ, LLC | 932.17 |
| #Columbia Care New Jersey, LLC | 929 |
| #GTI New Jersey, LLC | 927.33 |
| *Verano NJ, LLC | 920.67 |
| *JG New Jersey, LLC | 913.33 |
| Altus New Jersey, LLC | 901.67 |
| Bloom Medicinals of PA, LLC | 894.83 |
| Pangaea Health & Wellness, LLC | 801.67 |

---

[24] The asterisk (*) denotes a chosen applicant. The pound sign (#) denotes a bypassed applicant selected in another region.