52 A.3d 207

NATURAL MEDICAL, INC. AND NIR SHALIT, APPELLANTS, v. NEW JERSEY DEPARTMENT OF HEALTH AND SENIOR SERVICES[1] AND POONAM ALAIGH, M.D., AS COMMISSIONER, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 10, 2012—Decided October 4, 2012.

---

[1] The Legislature recently changed the name of the Department of Health and Senior Services to the Department of Health. *L.* 2012, *c.* 17, § 93 (approved June 29, 2012).

Before Judges PARRILLO, SABATINO and FASCIALE.

*Neal E. Wiesner* argued the cause for appellants.

*Kimberly E. Jenkins,* Deputy Attorney General, argued the cause for respondents (*Jeffrey S. Chiesa,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Susan J. Dougherty,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

At issue is whether the New Jersey Compassionate Use Medical Marijuana Act (Act), *N.J.S.A.* 24:6I–1 to –16, grants appellants, a for-profit corporation and its principal, an unqualified right to apply for permits to operate alternate treatment centers (ATCs)

to cultivate and distribute marijuana and to have their applications processed and evaluated irrespective of need. Subsumed within this issue is the question of whether in limiting the initial permitting to the statutorily-mandated minimum of six ATCs, the Department of Health (Department) acted arbitrarily, unreasonably, or in contravention of the Act. For reasons that follow, we answer both questions in the negative.

By way of background, the Act, originally made effective six months after enactment on January 18, 2010, *L.* 2009, *c.* 307, § 19, was later amended to extend the effective date to October 1, 2010. *L.* 2010, *c.* 36, § 1. *See N.J.S.A.* 24:6I–1 (discussing the amendment in the historical and statutory notes following the Act and committee statement). It vests the Department with the responsibility for implementing the State's medicinal marijuana program. *N.J.S.A.* 24:6I–1 to –16. These responsibilities include establishing a registry of qualified patients and primary caregivers, *N.J.S.A.* 24:6I–4, and processing applications for permits to operate ATCs, *N.J.S.A.* 24:6I–7. The Legislature authorized ATCs as the entities to cultivate and distribute medicinal marijuana to qualifying patients and their caregivers. *N.J.S.A.* 24:6I–7(a); *N.J.S.A.* 24:6I–3.

The Act charges the Department with responsibility to "ensure the availability of a sufficient number of [ATCs] throughout the State, *pursuant to need* ...." *N.J.S.A.* 24:6I–7(a) (emphasis added). To this end, the Legislature fixed a statutory minimum number of ATCs: "at least two each in the northern, central, and southern regions of the State," *ibid.,* and expressly designated they be operated by non-profit entities, *ibid.* No such restriction, however, attends subsequent permits, as they may be issued to either for-profit or non-profit entities. *Ibid.*[2] Beyond the mandat-

---

[2] Thus, *N.J.S.A.* 24:6I–7(a) provides in relevant part:

The [D]epartment shall accept applications from entities for permits to operate as alternative treatment centers, and may charge a reasonable fee for the issuance of a permit under this section. *The [D]epartment shall seek to ensure the availability of a sufficient number of alternative treatment*

ed minimum, the Department has discretion to determine how many ATCs are needed to meet the demand for medicinal marijuana and whether the issuance of a permit to a particular applicant would be consistent with the purposes of the Act. *N.J.S.A.* 24:6I–7(e).[3]

The Department also has discretion to determine the kind and amount of information necessary to process permit applications and to regulate the ATCs. *N.J.S.A.* 24:6I–7(b) and (i). In this regard, the Act tasks the Commissioner of Health (Commissioner) with the responsibility to "promulgate rules and regulations to effectuate the purpose of this [A]ct, in consultation with the Department of Law and Public Safety." *N.J.S.A.* 24:6I–16(a). In advance thereof, the Commissioner and the Director of the Division of Consumer Affairs are authorized to "take such anticipatory administrative action . . . as may be necessary to effectuate the provisions of this [A]ct." *L.* 2009, *c.* 307, § 19.

To that end, on November 15, 2010, the Department proposed regulations for implementing the Act and establishing the medicinal marijuana program. 42 *N.J.R.* 2668(a) (Nov. 15, 2010). However, on December 13, 2010, the Legislature passed a concurrent resolution declaring that portions of the proposed rules were inconsistent with the Act. S. Res. 130; Assemb. Res. 151; *cf.* 43 *N.J.R.* 340(a) (Feb. 22, 2011). Pertinent here, one of the proposed regulations would have only permitted four ATCs to actually

---

*centers throughout the State, pursuant to need, including at least two each in the northern, central, and southern regions of the State. The first two centers issued a permit in each region shall be nonprofit entities, and centers subsequently issued permits may be nonprofit or for-profit entities.*
[ (Emphasis added).]

[3] *N.J.S.A.* 24:6I–7(e) provides in pertinent part:

The [D]epartment shall issue a permit to a person to operate as an alternative treatment center *if* the [D]epartment finds that issuing such a permit would be consistent with the purposes of this [A]ct and the requirements of this section are met. . . .
[ (Emphasis added).]

dispense marijuana as opposed to the six required by the Act.[4] Consequently, the Department published new rules in February 2011. 43 *N.J.R.* 340(a) (Feb. 22, 2011). "The reproposed new rules differ from the rules proposed at 42 *N.J.R.* 2668(a) by providing for six alternative treatment centers (ATCs) that cultivate and dispense medicinal marijuana...." 43 *N.J.R.* 340(a). Following a comment period, the Department adopted the rules on November 23, 2011, apparently without any amendments. 43 *N.J.R.* 3335(a) (Dec. 19, 2011). The rules became effective December 19, 2011. *Ibid.*[5]

While formal adoption of the regulations was pending, on or about January 13, 2011, the Department posted a Request for Applications (RFA) for ATC permits on its website and required that completed applications be filed by February 14, 2011. In the applicant eligibility section of the RFA, the Department provided that, consistent with the statute, applicants must be non-profit entities organized under the laws of the State of New Jersey[6] since the agency had determined not to issue more than six permits for ATCs at the outset.[7] Moreover, in response to several inquiries about the RFA, the Department, on its Frequently

---

[4] The statement accompanying the concurrent Resolution noted in pertinent part:

> These prohibitions, when combined with the [D]epartment's stated intent to initially authorize only two alternative treatment centers to cultivate medical marijuana, and only four to dispense it, will significantly limit patient access to alternative treatment centers that dispense marijuana. Such limited access was not intended by the Legislature when enacting the statute.

[5] The regulations concerning ATCs are found in *N.J.A.C.* 8:64.

[6] Specifically, the RFA provided that "[t]he first two ATCs issued a permit in each region shall be nonprofit entities organized under the laws of the State of New Jersey."

[7] The RFA also included a section outlining the review and evaluation criteria that the Department would utilize to evaluate the applications, referencing, in this regard, *N.J.A.C.* 8:64 and "Rules Related to the Medicinal Marijuana Program." However, as noted, those regulations were not yet promulgated.

Asked Questions (FAQ) webpage, reiterated that only non-profit applicants may apply. According to the Department, its decision to initially limit the number of ATC permits to six was "part of a bi-partisan agreement reached with the Assembly sponsor of [the] Act in early December 2010."

By February 14, 2011, twenty-one separate entities had submitted thirty-five applications for ATC permits. After evaluating the applications based on criteria in the RFA, the Department awarded six permits, all to non-profit entities: two permits in the north region, two in the central region, and two in the south region.[8] Because the Department had previously announced that it would limit the number of permits to six at the program's start, appellants Natural Medical, Inc. and Nir Shalit, desirous of owning and operating three ATCs, did not submit applications pursuant to the RFA, lest they not be accepted by the agency. They now appeal, arguing that the Department was statutorily mandated to not only accept their applications, but also grant them ATC permits if shown to be otherwise qualified.

 Preliminarily, we consider the appealability of this matter. *Rule* 2:2–3(a) provides that "appeals may be taken to the Appellate Division as of right ... to review final decisions or actions of any state administrative agency." Apropos here, the Act expressly states that "denial of an [ATC permit] application shall be considered a final agency decision, subject to review by the Appellate Division of the Superior Court." *N.J.S.A.* 24:6I–7(e).

---

[8] On February 10, 2011, the Association of Safe Access Providers (Association) filed an emergent application in this court to stay the Department's acceptance, review and processing of applications for permits to operate ATCs until properly adopted regulations were in effect to implement the Act. We denied that application, finding no irreparable harm and additionally that

> the Act does not require formal adoption of regulations as a condition precedent to requesting proposals or applications to operate [ATCs]. The Act expressly provides for the Commissioner "to take such anticipatory administrative action ... as may be necessary to effectuate the provisions [of] this act."

In this case, appellants never submitted a completed application to the Department and, thus, never received a final agency decision of denial from which to appeal. Nevertheless, it is undisputed that the Department would not accept, let alone process and review, applications for ATC permits from for-profit entities. This was made clear not only on the Department's website and in its RFA, but as well, according to appellants, in representations orally made by the agency in response to their specific inquiries.

"Because many administrative decisions are not, as in the case of formally entered judgments, facially identifiable as final actions[,] ... other indicia are required to determine whether an agency action is final." Pressler & Verniero, *Current N.J. Court Rules,* comment 3.3 on *R.* 2:2–3 (2012). In this regard, it is well-settled that our "jurisdiction extends not only to State agency action but also agency *inaction.*" Pressler & Verniero, *supra,* comment 3.1 on *R.* 2:2–3(a)(2) (emphasis added); *see also N.J. Civil Serv. Ass'n v. State,* 88 *N.J.* 605, 612, 443 *A.*2d 1070 (1982); *Pascucci v. Vagott,* 71 *N.J.* 40, 52, 362 *A.*2d 566 (1976); *Vas v. Roberts,* 418 *N.J.Super.* 509, 516, 14 *A.*3d 766 (App.Div.2011). Given the actual consequences to, and impact upon, appellants, we consider the Department's expressed refusal to accept applications from for-profit entities in awarding the first round of ATC permits to be the virtual equivalent of a definitive, final agency decision of denial and therefore reviewable by us. In fact, the Department has voiced no challenge to our assertion of jurisdiction in this instance.

To be sure, the manner in which the Department proceeded vis-à-vis appellants and others similarly situated leaves a record barren of any factual and legal conclusions. *See R.* 2:4–1(b). But there is no doubt here as to the rationale for the agency's inaction or the grounds upon which it must be judged, and the finality of its decision as it affects appellants is unmistakable. *See In re CAFRA Permit No. 87–0959–5,* 152 *N.J.* 287, 299–302, 704 *A.*2d 1261 (1997); *In re Elizabethtown Water Co.,* 107 *N.J.* 440, 460, 527

A.2d 354 (1987); Pressler & Verniero, *supra,* comment 3.3 on *R.* 2:2–3. In our view, the Department's refusal to accept an application from appellants is so effectively dispositive of the case as to be functionally akin to a final judgment as to permit its appeal without an ensuing order. *Cf. Kimball Int'l v. Northfield Metal Prods.,* 334 *N.J.Super.* 596, 605–06, 760 *A.*2d 794 (App.Div.2000), *certif. denied,* 167 *N.J.* 88, 769 *A.*2d 1051 (2001).

■ In any event, "because the allocation to the Appellate Division is not jurisdictional in the strict subject-matter sense, [we] may, in the public interest, opt to address the merits of a dispute improvidently brought before [us]." Pressler & Verniero, *supra,* comment 3.2.2 on *R.* 2:2–3; *see also Vas, supra,* 418 *N.J.Super.* at 523–24, 14 *A.*3d 766 (involving exercise of our jurisdiction in the interests of the public and judicial economy, even though proper forum for challenging actions of the Speaker of the General Assembly was the Law Division); *Morales v. Cnty. of Hudson,* 236 *N.J.Super.* 406, 420, 566 *A.*2d 191 (App.Div.1989) (involving emergent jail crisis). Clearly, the issue raised by appellants—concerning implementation of this State's medicinal marijuana program—necessarily implicates the public interest. It is also essentially one of law. *See O'Shea v. N.J. Schools Constr. Corp.,* 388 *N.J.Super.* 312, 319, 908 *A.*2d 237 (App.Div.2006); *In re Boardwalk Regency Corp. for a Casino License,* 180 *N.J.Super.* 324, 333–34, 434 *A.*2d 1111 (App.Div.1981), *aff'd as modified,* 90 *N.J.* 361, 447 *A.*2d 1335 (1982). Indeed, a remand would be pointless given that the agency has since announced its reason for limiting initial licensure to the statutorily mandated minimum, and therefore no further factfinding or administrative expertise or discretion would seem to be involved. *See In re Plainfield's Park–Madison Site,* 372 *N.J.Super.* 544, 552, 859 *A.*2d 1232 (App. Div.2004), *certif. denied,* 182 *N.J.* 630, 868 *A.*2d 1032 (2005); *DKM Residential Props. Corp. v. Twp. of Montgomery,* 363 *N.J.Super.* 80, 86, 831 *A.*2d 110 (App.Div.2003), *rev'd on other grounds,* 182 *N.J.* 296, 865 *A.*2d 649 (2005). Thus, our resolution of the appeal would terminate the matter and avoid unnecessary further litiga-

tion. In view of the significance of the legal issue presented, we exercise our jurisdiction in both the public interest and the interest of judicial economy and now proceed to the merits of appellants' challenge.

Appellants' claim of arbitrary and unreasonable administrative action is grounded in the assumption that the Legislature's use of the term "shall" in *N.J.S.A.* 24:6I–7(e) means that the Department is mandated to accept and process all applications and grant ATC permits to every applicant who meets the Act's qualifications. This interpretation, of course, would allow for an unlimited number of ATCs regardless of need. The plain language of the Act, however, belies appellants' construction.

■ Although use of the term "shall" is generally indicative of the strength of the Legislature's intent, it has been construed on occasion as directory, suggestive or instructive, rather than imperative, where it relates to the form and manner in which the law is to be carried out and more clearly implements legislative intent. *See In re State Bd. of Education's Denial of Petition to Adopt Regs. Implementing the N.J. High Sch. Voter Registration Law,* 422 *N.J.Super.* 521, 532, 29 *A.*3d 1079 (App.Div.2011); *N.J. Educ. Assn. v. State,* 412 *N.J.Super.* 192, 213, 989 *A.*2d 282 (App.Div.), *certif. denied,* 202 *N.J.* 347, 997 *A.*2d 232 (2010); *State v. Jorn,* 340 *N.J.Super.* 192, 196–97, 774 *A.*2d 507 (App.Div.2001); *Franklin Estates, Inc. v. Twp. of Edison,* 142 *N.J.Super.* 179, 184, 361 *A.*2d 53 (App.Div.1976), *aff'd,* 73 *N.J.* 462, 375 *A.*2d 658 (1977). Thus, the ordinary common meaning of "shall" may be "overcome by something in the character of the legislation in the context which will justify a different meaning." *In re Appointment to Hudson Cnty. Bd. of Elections,* 220 *N.J.Super.* 367, 371, 532 *A.*2d 269 (App.Div.1987), *certif. denied,* 110 *N.J.* 187, 540 *A.*2d 182 (1988).

The statutory provision at issue here, considered in full, does not allow for automatic licensure. Nor does it express an explicit legislative commitment to an unlimited number of ATCs. On the contrary, the "shall issue" language in *N.J.S.A.* 24:6I–7(e) is restricted by the qualification: *"if the [D]epartment finds that*

*issuing such a permit would be consistent with the purposes of this [A]ct* and the requirements of this section are met." (Emphasis added). A principal purpose of the Act is to "ensure the availability of a sufficient number of [ATCs] throughout the State, *pursuant to need.*" *N.J.S.A.* 24:6I–7(a) (emphasis added). The Department determines need, at least beyond the first six permits dedicated to non-profit entities, through the exercise of its statutorily-vested discretion. *N.J.S.A.* 24:6I–7(e). In other words, the Department decides how many ATCs are needed to meet the demand for medicinal marijuana, *ibid.,* as well we how the ATC application process is administered, *N.J.S.A.* 24:6I–7(b). Consequently, not only must the technical requirements of section 7(e) be met and the information contained in the RFA be verified, but there also must be a proven need for the ATC which the applicant is seeking to operate. *N.J.S.A.* 24:6I–7(e).

Here, in implementing the start-up phase of the program, the Department has decided to limit the initial number of ATC permits to the statutorily mandated minimum. Appellants have made no showing that this decision is arbitrary or unreasonable. Nor could they, given that the number of registered qualifying patients in the State was, at least as of the time of rejection, unknown.

In the absence of any such showing, "a strong presumption of reasonableness" attends an agency's exercise of its statutorily delegated duties. *In re Application of Holy Name Hosp. for a Certificate of Need,* 301 *N.J.Super.* 282, 295, 693 *A.*2d 1259 (App. Div.1997). This presumption "is even stronger when the agency has delegated discretion to determine the technical and special procedures to accomplish its task." *Ibid.*

Our role in reviewing administrative decisions is therefore limited. *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999). The agency's final decision "will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." *In re Herrmann,* 192 *N.J.* 19, 27–28, 926 *A.*2d 350 (2007). We defer to the administrative

"agency's expertise and superior knowledge of a particular field." *Id.* at 28, 926 *A.*2d 350. And although not bound by its determination of a purely legal issue, *Francois v. Bd. of Trs., Pub. Emps. Ret. Sys.,* 415 *N.J.Super.* 335, 348, 1 *A.*3d 843 (App.Div.2010), we generally defer to the interpretations of a state agency of the statutes and implementing regulations it administers, unless the interpretation is "plainly unreasonable," *In re Election Law Enforcement Comm'n Advisory Opinion No. 01–2008,* 201 *N.J.* 254, 260, 989 *A.*2d 1254 (2010). Judicial deference is particularly appropriate "when the case involves the construction of a new statute by its implementing agency." *In re Freshwater Wetlands Prot. Act Rules, N.J.A.C. 7:7A–1.1 et seq.,* 238 *N.J.Super.* 516, 527, 570 *A.*2d 435 (App.Div.1989).

██ Governed by these principles, appellants simply have not shown that the Department acted unreasonably in limiting the initial issuance of ATC permits to the statutory minimum. As noted, the Act mandates that the Department issue the first six ATC permits to non-profit entities, but beyond that only requires the agency to issue ATC permits "*if* the [D]epartment finds that issuing such a permit would be consistent with the purposes of this act," *N.J.S.A.* 24:6I–7(e) (emphasis added), foremost of which is to "ensure the availability of a sufficient number of alternative treatment centers throughout the State, *pursuant to need,*" *N.J.S.A.* 24:6I–7(a) (emphasis added).

We do not consider it unreasonable to fix a minimum number at the outset of the program while gauging the need for additional ATCs once the program becomes operational. It is self-evident that in order to measure the demand for ATCs beyond the statutorily mandated minimum, the Department must first determine the number of qualifying patients who register for the program. And as concerns the initial issuance of the six ATC permits, the Act expressly authorizes the Commissioner to "take such anticipatory administrative action . . . as may be necessary to effectuate the provisions of this [A]ct." *L.* 2009, *c.* 307, § 19.

■ Thereafter, the Department, as with all other administrative agencies, "possess[es] the ability to be flexible and responsive to changing conditions." *Texter v. Dep't of Human Servs.*, 88 *N.J.* 376, 385, 443 *A.*2d 178 (1982); *see also Deborah Heart & Lung Ctr. v. Howard,* 404 *N.J.Super.* 491, 503, 962 *A.*2d 577 (App.Div.), *certif. denied,* 199 *N.J.* 129, 970 *A.*2d 1046 (2009). In fact, the Act charges the Department with the continuing responsibility of closely monitoring access issues. Specifically, the Act requires the Department to "evaluate whether there are sufficient numbers of [ATCs] to meet the needs of registered qualifying patients throughout the State" within two years of the effective date of the Act, and every two years thereafter. *N.J.S.A.* 24:6I–12(c). Moreover, the Department is required to periodically issue reports to the Governor and the Legislature regarding, among other things, the number of patient applications, and the number of ATC permits issued. *N.J.S.A.* 24:6I–12(a).

In these particular circumstances, and given the built-in statutory safeguards that "need" will be assessed on an ongoing basis, we defer to the Department's threshold determination to institute the State's medicinal marijuana program with no more than the statutorily prescribed minimum number of ATCs. This decision follows the law, violates no express or implied legislative policies, and has not been shown to be unreasonable. Consequently, the Department's announced declination to accept applications from for-profit entities at the outset of the program was not improper.[9]

Affirmed.

---

[9] In light of this disposition, we need not address appellants' further challenges to the RFA itself. As to their remaining argument that the application process was wrongly governed by proposed rules not yet adopted and in effect, suffice it to say the Department's treatment of appellants was soundly based on the Act itself.