**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0783-21
     A-0943-21
     A-1326-21

IN THE MATTER OF THE
DENIAL OF THE DISPENSARY
PERMIT ENDORSEMENT FOR
AP NJ HEALTH, LLC, TO
OPERATE AN ALTERNATIVE
TREATMENT CENTER
PURSUANT TO THE 2019
REQUEST FOR APPLICATION
PROCESS.

_____

IN THE MATTER OF THE
DENIAL OF DISPENSARY
PERMIT ENDORSEMENT FOR
GREEN LEAF MEDICAL OF
NEW JERSEY, LLC, TO
OPERATE AN ALTERNATIVE
TREATMENT CENTER
PURSUANT TO THE 2019
REQUEST FOR APPLICATION
PROCESS.

_____

IN THE MATTER OF THE DENIAL
OF DISPENSARY PERMIT
ENDORSEMENT FOR NJ HOLISTIC
HEALTH, LLC, TO OPERATE AN

ALTERNATIVE TREATMENT
CENTER PURSUANT TO THE
2019 REQUEST FOR
APPLICATION PROCESS.

_____

Argued (A-0783-21, A-1326-21) and Submitted (A-0943-21) October 11, 2023 – Decided December 8, 2023

Before Judges Whipple, Mayer, and Enright.

On appeal from the New Jersey Cannabis Regulatory Commission.

John W. Bartlett argued the cause for appellant AP NJ Health, LLC, in A-0783-21 (Murphy Orlando, LLC, attorneys; John W. Bartlett, Jason F. Orlando, and Tyler Newman, on the briefs).

Law Offices of Louis N. Magazzu, LLC, attorneys for appellant Green Leaf Medical of New Jersey, LLC, in A-0943-21 (Louis N. Magazzu, on the brief).

Joshua S. Bauchner argued the cause for appellant NJ Holistic Health, LLC, in A-1326-21 (Mandelbaum Barrett, PC, attorneys; Joshua S. Bauchner and Rahool Patel, on the briefs).

Maeve E. Cannon argued the cause for respondent Altus New Jersey, LLC, in A-0783-21 (Stevens & Lee, PC, attorneys; Maeve E. Cannon, of counsel and on the brief; Michael A. Cedrone, on the brief).

Kathleen McGee (Lowenstein Sandler, LLP) of the New York bar, admitted pro hac vice, argued the cause for respondent Holistic NJ I, LLC, in A-0783-21 (Lowenstein Sandler, LLP, and Kathleen McGee,

attorneys; Christopher S. Porrino and Lauren E. VanDriesen, of counsel and on the brief).

Jacqueline R. D'Alessandro, Deputy Attorney General, argued the cause for respondent New Jersey Cannabis Regulatory Commission (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, on the briefs).

PER CURIAM

We consider three back-to-back appeals from Final Agency Decisions (FADs) denying permit endorsements that each arose from the Request for Applications (RFA) issued by the Department of Health (DOH) in July 2019. The focus of the RFA was to select entities to operate Alternative Treatment Centers (ATCs): dispensaries, cultivation sites, and vertically integrated (VI) operations to grow, process, and sell marijuana as part of the State's Medicinal Cannabis Program (MCP). The three appellants are AP NJ Health, LLC., (AP); NJ Holistic Health, LLC., (Holistic); and Green Leaf Medical of New Jersey, LLC (Green Leaf). Each of these appellants argues the selection process resulted in their endorsements being denied.[1] We affirm.

---

[1] Because these endorsements are the functional equivalent of permits, the terms were used interchangeably in the RFA.

A-0783-21

I.

The Compassionate Use of Medical Cannabis Act, N.J.S.A. 24:6I-1 to -56, (the Act) provides qualifying patients and their caregivers with protection from arrest, prosecution, and other penalties for possessing cannabis for medical purposes. N.J.S.A. 24:6I-2(e).[2] The Act also protects those authorized to produce, process, and dispense cannabis pursuant to the statute's terms. N.J.S.A. 24:6I-7.

Initially, the Act charged the DOH with implementing New Jersey's MCP. Nat. Med., Inc. v. N.J. Dep't of Health & Senior Servs., 428 N.J. Super. 259, 262 (App. Div. 2012). This included creating a registry of qualified patients and issuing permits for the operation of ATCs. N.J.S.A. 24:6I-4; N.J.S.A. 24:6I-7.1; Nat. Med., 428 N.J. Super. at 262. The Cannabis Regulatory Commission (CRC) has since assumed the management of the MCP. N.J.S.A. 24:6I-24(a).

N.J.S.A. 24:6I-7(h)(3) requires the CRC "seek to ensure the availability of a sufficient number of [ATCs] throughout the State, pursuant to need." The CRC must issue permits for "at least two [ATCs] each in the northern, central, and southern regions of the State." Ibid. These first six ATCs, which were all

---

[2] All citations to the Act are to its current amended form, L. 2021, c. 252.

VI,[3] as that was the only permit type then provided for by the Act, were chosen in 2011. Beyond this minimum, "the [CRC] has discretion to determine how many ATCs are needed to meet the demand for medicinal marijuana and whether the issuance of a permit to a particular applicant would be consistent with the purposes of the Act." Nat. Med., 428 N.J. Super. at 263. The CRC has promulgated regulations, N.J.A.C. 17:30A-1.1 to -13.11, which provide the framework through which it issues RFAs for the operation of ATCs.[4]

In January 2018, Governor Philip D. Murphy issued Executive Order 6 to expand access to medical marijuana. To ensure that the growing population of qualified patients would be adequately served by the MCP, DOH issued a second RFA to select six more entities for VI ATC permits and chose six winners. Several unsuccessful applicants appealed, asserting issues with the RFA, scoring process, and choice of ATC operators. In a previous set of appeals, we concluded the scores appellants' applications received raised concerns about DOH's selection process. In re Application for Med. Marijuana Alt. Treatment

---

[3] VI permit holders are expected to cultivate, manufacture, and dispense cannabis as part of the MCP. See N.J.A.C. 17:30A-7.1(e).

[4] The regulations were initially found at N.J.A.C. 8:64-1.1 to -13.11 but were amended and recodified as of May 2019. See 50 N.J.R. 1398(a) (June 18, 2018); 51 N.J.R. 732(a) (May 20, 2019).

A-0783-21

Ctr. for Pangaea Health and Wellness, LLC, 465 N.J. Super. 343 (App. Div. 2020). We found it problematic that those appellants received a wide variety of scores—ranging from "zero" to "perfect"—from different reviewers on some of the same application criteria. We also found the lack of explanation from DOH for these anomalous scores rendered the agency's rejection of the applications arbitrary and capricious and remanded the matter for further action.

On remand, DOH's successor, the CRC, reviewed the application process, changed no scores awarded to any applicant, and issued new final agency decisions again rejecting appellants' applications. In re Cannabis Regul. Commission's Disqualification of Bloom Meds. of PA, Nos. A-0569-21 (App. Div. May 4, 2023),[5] we affirmed the CRC's decisions denying permits to all appellants because the agency's procedures on remand complied with our mandate, concluding it provided sufficient explanations and analysis.

---

[5] In re Cannabis Regul. Commission's Disqualification of Bloom Meds. of PA involved the eight back-to-back appeals from the Pangaea remand including appellants Bloom Medicinals of PA, LLC; Pangaea Health and Wellness, LLC; Harvest of New Jersey, LLC; Liberty Plant Sciences, LLC; GGB New Jersey, LLC; and Altus New Jersey, LLC challenging the rejection of their applications to operate ATCs by DOH pursuant to the July 2018 RFA for a second time. Although citing an unpublished decision is generally forbidden, we do so here to provide a full understanding of the issues presented pursuant to Rule 1:36-3 that permits citation to the extent required by res judicata, collateral estoppel, the single controversy doctrine or any other similar principle of law.

Following the 2018 RFA, DOH implemented additional reforms to the MCP, including reducing fees for qualified patients and amending its regulations.[6]

The Act was amended effective July 2, 2019,[7] and now provides the CRC may issue separate permits for entities to operate as medical cannabis cultivators, manufacturers, or dispensers. N.J.S.A. 24:6I-7(a)(1); N.J.A.C. 8:64-7.1(e). There are three types of permits, but VI permits now consist of a set of one cultivation, one manufacturing, and one dispensary permit. The new N.J.S.A. 24:6I-7.2(c), (d), and (e) set forth detailed lists of criteria the CRC now must use in evaluating applications for each type of permit.

On July 1, 2019, DOH issued a third RFA seeking applicants for the new types of permits that would soon be available: five cultivation endorsements, fifteen dispensary endorsements, and four VI endorsements. This included one VI, two cultivation, and five dispensary endorsements each for the northern and central regions of the state, and one VI, one cultivation, and five dispensary endorsements for the southern region. Applicants could only apply for one

---

[6] See 50 N.J.R. 1398(a); 51 N.J.R. 732(a) (effective May 20, 2019).

[7] See L. 2019, c. 153. Because the RFA was issued one day prior to the amendments' effective date, it is governed by the prior iteration of the Act.

cultivation endorsement and submit one application per region. However, applicants could not apply for both VI and individual endorsements and would not be awarded more than one permit (except if awarded the set of three associated with a VI permit).

The deadline for submission of VI applications was August 22, 2019. DOH conducted a "Pre-Application Webinar" on August 2, 2019. DOH also answered questions submitted by prospective applicants in a "Frequently Asked Questions" document. DOH received 196 applications for all the types of endorsements, including forty-nine VI applications.

The RFA described the application. Part A, titled "Mandatory Information," included the applicant entity's organizational documents; evidence of good standing with the Department of the Treasury; information about principal officers, directors, owners, and board members; verification of the approval of the municipality where the ATC would be located; evidence of ownership or lease of the proposed site; and evidence of compliance with local laws.

Part B consisted of the "Scored Criteria" upon which applicants would be judged. These criteria asked applicants to describe their proposed operations, experience, security and quality control plans, financing, and other aspects of

8

running an ATC. Applicants were directed to file a PDF or printed document of not more than 100 pages for each endorsement they sought for Part B. VI applicants needed to submit three Part B documents, one for each part of the VI permit set.

Once received, DOH would "review [all applications] for completeness and truthfulness" to determine "whether an applicant passes or fails a particular requirement in the mandatory section." This completeness review reduced the number of VI applications to thirty-seven, with twelve in the central region including AP's. If an application was found complete, its Part B would then be "reviewed and scored by a selection committee" comprised of nine employees from DOH, the Department of the Treasury, the Department of Environmental Protection, and the Department of Labor. The nine selection committee members had diverse expertise that was pertinent to the review process. Each member was subject to the provisions of the Uniform Ethics Code and were screened for real and perceived conflicts of interest.

In September 2019, the selection committee members attended training explaining the history, development, and the then-current state of the MCP, and discussing how they were to review applications. They were also provided with detailed instructions for scoring each criterion and measure. The instructions

told reviewers what to consider when evaluating applications and when it was appropriate to give a score of zero, the maximum possible points, or any score in between.

To complete scoring of applicants' Part B submissions, the CRC divided the selection committee members into three teams of three based on their expertise and assigned each team to review a specific group of criteria and measures for which that expertise was relevant. For VI applications, each team was responsible for a maximum of 300 points, representing 100 points for each of the three permit endorsements making up a VI permit. Thus, the maximum total score for VI applications was 900 points.

Team one had experience in "quality assurance, public health, emergency preparedness, pharmaceutical assistance, fiscal management, public affairs, and the management of environmental resources." This team reviewed Criteria 1 through 5, which concerned applicants' "ability to meet the overall health needs of qualified patients and safety of the public"; "history of compliance with regulations and policies governing government-regulated marijuana programs"; "ability and experience . . . in ensuring an adequate supply of marijuana"; "community support and participation"; and "ability to provide appropriate research data." Team two had experience with "regulation of the cultivation,

10

manufacturing and dispensing of medicinal cannabis." These members reviewed Criterion 6, which dealt with applicants "experience in cultivating, manufacturing, or dispensing marijuana in compliance with government-regulated marijuana programs." For Teams one and two, an average was taken of the three reviewers' scores to create an applicant's total score for the team's portion of the application.

Team three reviewed Criterion 7, which comprised four measures, including labor compliance, business development and minority-owned (MBE), woman-owned (WBE), and veteran-owned (VOB) business certifications, and workforce development. Scores for these measures were added together to create the total score for Team three for each application. Then, the scores for the three teams were added together, generating the final composite score.

Once all the committee members completed their review, their scores were compiled into a "master spreadsheet." The entry of the reviewers' individual measure scores was "checked at least twice and validated against each scorer's scoresheet[s]" to ensure against mistakes. CRC staff then conducted a quality control review and audit.

For its statistical audit, CRC staff "conducted a thorough statistical analysis of each reviewer's scores, each team's composite scores, and the final

11

composite scores," "analyzed the distribution around the mean of the three teams' scores," and "searched for any outliers in the final total scores." Only two measure scores were found to be statistical outliers, and these were "confirmed as validly and properly assigned" after staff asked the committee members who issued the scores to revisit the applications and explain their reasoning. The analysis revealed, although there was "some variation between scorers on the same teams, . . . each scorer was consistent with the distribution of their scores across the whole pool of applications." In other words, while one reviewer on a team may have awarded lower scores than the others, these scores were consistently lower, rather than showing great internal differences between the best and worst.

On October 15, 2021, the Executive Director of the CRC sent a Recommendation Memorandum (RM) to the Board of Commissioners of the CRC stating the selection committee's recommendations for the cultivation and VI portions of the 2019 RFA. The RM discussed the importance of revisiting the level of patient need for medicinal cannabis, since the RFA had been issued over two years previously and the number of qualified patients had risen significantly. It noted, despite increased enrollment, there was only "a little more than half" of the cultivation canopy required to meet market needs and

provide patients with "access to diverse products at affordable prices." The RM also discussed the effects of the legalization of recreational cannabis on the MCP. It recommended the CRC award ten cultivation permits instead of the five contemplated by the RFA as written. It did not advise raising the number of VI permit awards beyond four.

The top applicant for a VI permit in the central region, respondent Altus New Jersey, LLC (Altus), was recommended to move forward with permitting after receiving a total score of 785. The highest-scoring candidates in the northern and southern regions were also chosen. The RM stated the fourth VI permit should be awarded in the central region because that area had the greatest patient need. It explained the mathematical calculations used to arrive at this conclusion. On October 15, 2021, the CRC adopted a resolution approving the recommended VI applications to move forward with permitting.

## II.

On appeal, our capacity to review agency actions is "limited." Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Env't Prot., 101 N.J. 95, 103 (1985). An agency's "final quasi-judicial decision" should be affirmed unless there is a "'clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Circus Liquors, Inc. v. Governing Body of

Middletown Twp., 199 N.J. 1, 9 (2009) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). The courts' "strong inclination" is to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989).

With specific regard to the administration of the MCP, in Institute for Health Research, No. A-000069-11 (App. Div. Aug. 22, 2013) (slip op. at 8), we noted the Legislature granted DOH "considerable discretion to act in furtherance of the goals of the Act." Therefore, the presumption was "enhanced" that DOH's administration of the 2011 RFA process was reasonable. Institute for Health Research, slip op. at 7. In Nat. Med. Inc. v. N.J. Dep't. of Health & Senior Servs., we said DOH had discretion to decide "whether the issuance of a permit to a particular applicant would be consistent with the purposes of the Act" and to determine "the kind and amount of information necessary to process permit applications." 428 N.J. Super. 259, 263 (App. Div. 2012).

AP

Earning 733.33 points, AP came in fifth place in the central region, after Altus, Holistic with 776.67 points, CHM Consulting LLC with 746.67 points, and Mission New Jersey with 738 points. On October 15, 2021, the CRC issued a FAD informing AP its application was denied.

A-0783-21

AP submitted a grievance to the CRC, asking why the agency increased the number of cultivation permits but not the number of VI permits, what "authorization and/or process was used to make [that] decision," and whether and when applicants' scorecards would be made available. The CRC responded to AP by referring to the RM and to the agency's website, where reviewers' scorecards for every application were made public.

In addition, the CRC issued a memorandum containing "General Responses to Debrief Questions" submitted by applicants. This memorandum explained the selection committee was divided into teams to take advantage of members' differing expertise and "so that no one selection committee reviewer had control over an application's overall score." Because reviewers worked independently and did not discuss their scores, there was some variation among scores given to applicants by different reviewers on the same measures. The memorandum discussed the quality control review and audit CRC staff performed to ensure that any such variance "was the result of an intentional, reasonable review of an application and not the result of a misunderstanding of the scoring instructions, or an inconsistent approach by a reviewer." Disagreement among reviewers on the relative merits on a response "[did] not mean the scores are inherently wrong or improperly delivered."

15

The memorandum also provided responses to specific issues raised by applicants. Graphs showed that all three Team one reviewers awarded scores along a "normal" curve, demonstrating that they "scored in a statistically consistent manner."

The memorandum addressed questions concerning Reviewer 3's scores on Criterion 7 Measure 3, which asked applicants to provide copies of any MBE, WBE, or VOB certifications they had been issued by the Department of the Treasury, Division of Revenue. Applicants that could provide such certification(s) would receive the full thirty points allotted for this measure. However, an applicant could receive partial credit by providing evidence that it would otherwise meet the MBE, WBE, or VOB certification requirements "once generating revenue." Reviewer 3 "was instructed to use their expertise to determine appropriate partial credit, based on the strength of the evidence provided in the application and their knowledge of the statutes and rules governing the . . . certification process." The "General Response" memorandum explained an applicant was given less credit if it, for example: stated it possessed or would apply for certifications from entities other than the Division of Revenue; submitted information in Part B that was contradictory to its ownership information in Part A or inconsistent with certification requirements;

16

submitted certifications for a related entity and not the applicant; presented a certification as its own that was actually registered to a different entity; stated that it did not meet certification requirements but would otherwise attempt to promote inclusion and diversity going forward; or did not submit sufficient information to determine whether it could qualify for a certification in the future. The memorandum further explained Reviewer 3's scores complied with the scoring instructions and were "consistent across applicants" and "reflective of the reviewer utilizing their unique expertise to evaluate the information submitted by applicants." This appeal followed.

AP argues the CRC acted arbitrarily, capriciously, and unreasonably in denying its application to operate a VI ATC. It contends the agency's decision is not entitled to deference, asserting that members of Team one and Team two did not have sufficient relevant expertise to score all the measures they were assigned.

Such arguments harken to our opinion in Pangaea, regarding the 2018 RFA but are not persuasive here. There, for the earlier RFA, DOH assembled a five-member selection committee including members from three agencies. Pangaea, 465 N.J. Super. at 373-74. However, despite the members' differing expertise, all were assigned to score all the criteria. Ibid. This meant that, for

example, "the Agriculture member was called upon to assess applicants' financial capacities, while the Treasury member was required to appraise applicants' horticultural capabilities." Id. at 374. As a result, and also because there was no way to know which of the committee members had which backgrounds, the court found it was "unclear" what level of deference to apply to the RFA scores. Ibid.

On remand, the CRC assembled a Quality Control Committee (QCC) to consider all the applications submitted for the 2018 RFA and the scores the evaluation committee awarded "to determine whether each score an applicant received was 'reasonably justified' and whether the evaluation committee complied with the RFA's scoring guidelines." In re Cannabis Regul. Comm'n's Disqualification of Bloom Meds. of PA, No. A-0569-21 (App. Div. May 4, 2023) (slip op. at 18). The QCC provided possible explanations for scores of zero given on several of the contested measures. Id. at 16-21. The QCC also performed a statistical analysis of each reviewer's scores and found that there was internal consistency therein. Id. at 21. Ultimately, the CRC adopted the QCC's recommendation that none of the applicants' scores be changed. Id. at 22. The appellants again appealed the rejection of their applications. Ibid.

In Bloom, we said the prior panel in Pangaea had not ordered the agency to alter scores "wherever there was a high relative error" and had instead "only asked that the scores be explained." Id. at 41. It said that "[t]he major question on remand was whether the scores could be harmonized with the review instructions and [the] appellants' responses, not whether each reviewer's score distribution fit the parameters of a particular statistical model." Id. at 43. Indeed, the court explicitly rejected the appellants' argument that a certain evaluation committee member's scores should be removed as "outliers" because they were consistently lower than those awarded by other members, finding that "this would have resulted in an uneven competitive playing field." Id. at 41.

We concluded that, ultimately, the CRC's new FADs rejecting the appellants' applications were based on "sufficient credible evidence in the record, including adequately detailed explanations" for the scores. Id. at 43.

Here, compared to Pangaea, there is both more evidence in the record concerning the committee members' knowledge and more assurance that this knowledge was properly applied. This time, the CRC provided detailed information about the expertise of each member of the selection committee. The agency divided up the work of scoring based on that expertise, ensuring each criterion was evaluated only by those with relevant knowledge and experience.

19

Contrary to AP's assertions, the record indicates Team one's members were all suited to review applicants' ability to meet the needs of the MCP, history of compliance with government regulations, ability to provide research data, and participation in the community, because each member had experience in areas such as quality assurance, pharmaceuticals, finance, and public affairs. Team two's members all had expertise with regulating medicinal cannabis and evaluated the criterion asking applicants about their experience in cultivating, manufacturing, and/or dispensing cannabis in compliance with regulated programs. Team three's work was split up even more specifically than the other teams.

AP argues the CRC tolerated too much relative error among scores given by different review committee members. Relative error is a statistical concept that, here, measures the difference between scores given on the same measure by different reviewers. A low relative error would mean that all reviewers gave the same or very similar scores, while 100% relative error would mean that one reviewer gave a perfect score and another gave a zero. Pangaea, 465 N.J. Super. at 364. Here, AP complains Reviewer 2 gave lower scores than the other two members of Team one. AP avers that it performed its own "[m]athematical analysis" of this difference, which showed "an upper-bound relative error of

17.4% for [itself], and a lower-bound relative error of 18.3% for Altus." AP claims this means its score "could have been as high as 860.93" while Altus's score "could have been as low as 641.35," and argues "one can have no confidence whatsoever" in the scores actually given.[8]

AP contends the CRC failed to adequately explain the alleged anomaly of Reviewer 2's scores and instead presented a "prebuttal" to any eventual arguments about the unreliability of the results. AP argues the CRC "failed to meaningfully address" the Pangaea court's concerns when developing its review process, thereby denying AP due process. It asserts the outcome of the RFA was "determined by the vagaries of the differences between the reviewers, and not by the solid concurrence of well trained and monitored individuals," and that therefore it "cannot reasonably be assumed" the "ATC applicants that were actually best qualified" were selected.

AP relies heavily on Pangaea, 465 N.J. Super. at 364-71, asserting the scoring process for the 2019 RFA had the same problems criticized in that case and that the CRC's justifications for the results here have "previously been rejected by this very court." We disagree.

---

[8] Neither AP's brief nor its appendices explains how it calculated these values.

A-0783-21

The record here is far different from that in <u>Pangaea</u>. First, there are no anomalous zeroes to be found on the score sheets, and no instances where some reviewers gave zeroes while others gave high or perfect scores, thus creating a question whether one or the other group misunderstood the measure or the scoring instructions. Second, the level of alleged relative error AP complains of is not similar to that in <u>Pangaea</u>; the differences among the scores given by reviewers on the same teams are not as wide. Unlike the appellants in <u>Pangaea</u>, AP does not raise an issue with its scores on any particular measures other than Criterion 7 Measure 3, discussed below. There are no specific instances of high relative error.

Third, and perhaps most importantly, the CRC did much more here than check the selection committee's mathematics and the accuracy of the data entry in its score spreadsheets. CRC staff "search[ed] for odd or outlying scores that could unfairly skew the results," <u>id.</u> at 380-81; questioned the reviewers that gave the only two scores flagged as potential outliers about their reasoning; checked the scores given against the RFA and scoring instructions to ensure reviewers complied with both; and performed a statistical analysis. Thus, the agency took multiple actions to improve its scoring process for the 2019 RFA compared to the lacking procedures this court criticized in <u>Pangaea</u>, and the

scores given in this case appear more defensible on their face than the seemingly inexplicable zeroes in the prior instance. We conclude the CRC provided sufficient explanations for the scores given in its RM and subsequent memo in response to applicant questions and grievances in the spirit of Pangaea's guidance, and that, therefore, confidence in its permittee selections is proper.

AP argues Criterion 7 Measure 3 was weighted too heavily when calculating VI permit applicants' scores. The measure was worth a maximum of thirty points for cultivation and dispensary applicants, but because VI applicants were expected to submit three Part B sections, it was worth up to ninety for them. AP states that, if scores for this measure were not tripled and the maximum possible score for VI applicants was 840 instead of 900, it would have ranked third in the central region and still would not have been chosen for a permit. AP argues removing Criterion 7 Measure 3 from the scoring entirely would result in it moving up to second place and the measure created a "structural bias" against new entities that could not yet provide the financial information necessary to qualify for a WBE, MBE, or VOB certification.

We reject the argument Criterion 7 Measure 3 was given undue weight. Based on our review, the weighting of Criterion 7 Measure 3 was not arbitrary, capricious, or unreasonable.

23

To qualify for a certification from the Division of Revenue, a business must be "at least fifty-one percent owned, operated, and controlled by persons who are Black, Hispanic, Asian American, American Indian, or Alaskan [N]ative" for MBE status or by "persons who are women" for WBE status. N.J.A.C. 17:46-1.3(b)-(c).[9] For either type of certification, a business must also be "independently owned, operated, and controlled" and be able to "demonstrate the ability to be considered a 'going concern,' as in the business has sufficient resources needed to continue operating indefinitely by normal industry standards." N.J.A.C. 17:46-1.3(d). "[O]wnership and control by minorities or women shall be real, substantial, and continuing, demonstrating authority over the affairs of the business, and shall go beyond the pro forma ownership of the business as reflected in its ownership documents." Ibid.

In the scoring instructions for Criterion 7 Measure 3, Reviewer 3 was told to give the full thirty points only to applicants that provided one or more of the relevant certifications. The instructions further stated:

> If the applicant fails to supply a certification because they are a brand new entity with no revenue, but supplies evidence they may meet the criteria once generating revenue, the scorer can [give] partial credit (up to [twenty five] p[oin]ts) based on the strength of the evidence provided. A score of [zero] should be only

---

[9] AP makes no claim that veterans are involved in its ownership or operation.

A-0783-21

given to applicants with no certification and that submitted no evidence supporting their ability to qualify in the future, or their involvement of minorities, women or veterans in their leadership. In lieu of a certification, scorers should consult Part A, Question 20 when assessing this measure. Individuals not listed on Part A, Question 20 should not be considered in the evaluation of this measure.

Part A Question 20 asked applicants to provide the names, birthdates, addresses, positions, and pay/compensation of all their owners, principals, partners, investors, members, board members, directors, trustees, and officers.

In its response to Criterion 7 Measure 3, AP stated it is "[seventy] percent owned by women and racial minorities," its board of directors is "[eighty] percent women," three of its "key vendors" are MBE and WBEs, and it had submitted an application to the Division of Revenue for WBE status on August 21, 2019, the day before RFA applications were due. AP said it was "committed to maintaining a meaningfully above-average percentage of its Board, Owners, Senior Management, Employees and Vendors as ethnic and culturally diverse," and it would "continue to work in good faith to hire and recruit the most talented and diverse team available."

AP stated it would provide a copy of a WBE certification once it acquired one. Instead, it included the first page of its application to the Division of Revenue. There is nothing visible in the redacted application indicating

25

definitively which of the twelve individuals named are women and/or minorities or, importantly, what percentage of the business each owns.

The two chosen applicants both submitted copies of their WBE certifications and thus received full credit on Criterion 7 Measure 3. The other two applicants who scored higher than AP in the central region, also submitted WBE or MBE certifications and received full marks. AP received fifteen points for each of the permit endorsements, bringing its score on this measure to forty-five.

AP's score on this measure was based on sufficient evidence in the record. While AP may be "[seventy] percent owned by women and minorities," it is unclear as to whether it is at least fifty-one percent owned by women or fifty-one percent owned by minorities. A business that is thirty-five percent owned by women and thirty-five percent owned by different people who are minorities could make the same claim as AP but be unqualified for WBE or MBE status. The fact that AP's board of directors is eighty percent women also is not relevant, since that number would be based on the number of people on the board, not percentage of ownership. Finally, AP sought a WBE certification, but that did not guarantee it would receive one. AP offered evidence it had a number of women in leadership positions within its organization but did not submit

A-0783-21

unambiguous proof that it would qualify for a WBE certification once it became a "going concern" as required by N.J.A.C. 17:46-1.3(d). None of AP's arguments would appreciably affect the outcome.

AP's remaining arguments lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

## Holistic

Holistic challenges CRC's denial of a dispensary permit endorsement to operate an ATC. After a review of Holistic's application, the CRC awarded it a total score of 200.67, meaning it did not obtain a sufficiently high score to be assigned a permit in the North region. Holistic argues the CRC's decision was arbitrary, capricious, and unreasonable, as well as unsupported by the evidence on record. Holistic asserts similar, previously discussed arguments that their score, in addition to the entire scoring process, is problematic due to the high relative error and discrepancy between reviewers' scores, and that the quality control process did not correct the scoring issues.

Holistic argues the entire scoring process had high levels of relative error and thus made the CRC's scoring arbitrary. We have addressed and rejected this general argument above.

27

Holistic's specific argument that its score from Team one led to an unacceptable high rate of relative error, like AP's, misinterprets the purpose of the remand in Pangaea. As we stated above, the mandate in Pangaea was to provide explanations, not to erase relative error or make the process conform its application scores to any particular statistical model. The issue was whether the CRC's explanations for the scores was accurate. Still, not every piece of evidence need be expounded upon or summarized; rather, the explanation generally only requires that one be able to determine from the document what facts or factors led to the conclusion. See Application of Howard Sav. Inst., 32 N.J. 29, 53 (1960). In Holistic's case, the CRC did not provide specific discussions of the scores, beyond the score sheets in the appendix.

This is different from Pangaea, where the DOH only provided the applicants with scores without any "why and wherefore" to support its selections. Pangaea, 465 N.J. Super. at 375. In its December 7, 2021 memorandum to all applicants, the CRC thoroughly explained its scoring and quality control processes. The explanation of said quality control process and scoring analysis outlined in the memo are sufficient to determine what factors led to the CRC's scores.

Unlike in <u>Pangaea</u>, nothing in Holistic's scores demonstrates multiple, unexplained zeroes within the scoresheet. There are also no instances where a reviewer gave a zero where another gave a perfect score. Instead, Holistic received consistent scores by each reviewer as a whole. Thus, Holistic's scores were neither anomalous nor arbitrary because the CRC provided sufficient explanations for the scores with its memo and the scoring was consistent.

Like AP, Holistic argues the score under Criterion 7 measure 3 is arbitrary and not supported by the record because it scored zero when it has women in senior positions. Holistic argues it expressly identified a female in a senior leadership position and her qualifications were sufficient to satisfy the criteria under the involvement of women in its leadership section. We disagree.

The Legislature established procedures to certify that a business is woman owned. N.J.S.A. 34:1B-227. Such business is one that is:

> (1) [a] sole proprietorship owned and controlled by a woman; or (2) [a] partnership or joint venture owned and controlled by women in which at least [fifty-one percent] of the ownership is held by women and the management and daily business operations of which are controlled by one or more women who own it; or (3) [a] corporation or other entity whose management and daily business operations are controlled by one or more women who own it . . . .
>
> [N.J.S.A. 52:27H-21.18(i).]

29

Holistic acknowledged it did not meet the criteria to be a certified women-owned business, but it had plans to obtain such certification, asserting that a woman was appointed as Vice-President, another woman was added to the company's Medical Advisory Board, and a third woman was a strategic advisor who was positioned to obtain equity in the endeavor.

The statute instructs ownership or control by "women shall be real, substantial, and continuing, demonstrating authority over the affairs of the business, and shall go beyond the pro forma ownership of the business as reflected in its ownership documents." N.J.A.C. 17:46-1.3(d). None of the three women listed by Holistic control the company over fifty-one percent. The women also do not manage the daily operations based on the explanation provided by Holistic, nor does the explanation provided identify how these individuals have authority over the business beyond their experience in the field.

Holistic also argues the CRC's quality control process was not sufficient to correct scoring anomalies and the threshold the CRC set for selecting anomalous scores was such that it would make it unlikely that any score be considered an anomaly. Holistic argues the QCC process does not detect outliers and the review of applications that received zeroes was not fit for the purpose because it disregarded scoring instructions and treated Holistic more harshly.

30

We are satisfied the December 7 memorandum explains what the quality control review would entail, which included a statistical analysis of the scores to find and review any outliers.

Green Leaf

Green Leaf also argues it received arbitrary and capricious scores and the FAD it received suffers from the same scoring issues that raised concern in Pangaea. In particular, Green Leaf asserts error in the scores it received on several measures—Measures 4-1 and 5-1. We reject these arguments.

Measure 4-1 asked for evidence of ties to the local community, specifically requiring applicants to provide "a list of all owners, officers, board members, and principals that have resided in New Jersey for at least [two] years, and supply proof of their residency." The scoring instructions provided the following guidance: "Assess [] ties to the local community through the history of the residence of the owners, officers, board members and principals of the proposed business." The highest possible score would theoretically go to a business made up of individuals who have all lived in New Jersey for two years and submitted documentation to prove residency.

Scorers were directed to Part A, Question 20, to cross-reference the list of people provided with the full list of owners, board members, and principals of

the entity.  Scorers were instructed to only take into account individuals listed on Part A, Question 20.  Green Leaf's response to Measure 4-1 showed four of its owners, board members, or principals are residents of New Jersey.  Green Leaf's response to Part A, Question 20, identified a total of twelve owners, principals, and board members.  Only four of the twelve owners, principals, and board members were demonstrated to be New Jersey residents.  Green Leaf received a composite score of 14.66/20 for this measure—a reflection of its partial responsiveness to the question posed.

Measure 5-1 asked for evidence of past research contributions "in the form of cited original and published work" that sought to expand "clinical and scientific research related to medical cannabis or the debilitating medical conditions that can be treated with medical cannabis."  Research contributions for this measure are defined as original work (i.e., produced by an individual associated with the applicant) that is published and for which a citation is provided.  Under the instructions provided, the highest possible scores were to be given to applicants who demonstrated a track record in getting research on medical cannabis published in academic, peer-reviewed journals.

Green Leaf's response indicates that it retained Drs. Paul Lyons, Vincent Njar, and Maneesh Sharma as Advisory Board members, and Susanne Dietz

Goldberg as its Chief Science Officer, and details their research on cannabis, the human genome, design and lab protocols, cancer, pain management and opioids. However, Green Leaf did not provide evidence of its own past research contributions and did not provide records of the Advisory Board doctors' publications in academic, peer-reviewed journals on medical cannabis. Thus, Green Leaf received a composite score of 7.66/10 for this measure—a reasonable reflection of its overall responsiveness to much of the question, coupled with its failure to provide proof of past research contributions and track record of publication in medical cannabis journals.

Green Leaf next argues that Reviewer 2's lower overall scores "reflect[] the subjectivity of the scoring method." We reject this argument, having concluded there is nothing inherently arbitrary or capricious about Reviewer 2's scores. The statistical analysis undertaken by CRC staff confirmed the overall scores, scores delivered by specific reviewers, and scores from each team were consistent and distributed in accordance with a normal and expected statistical curve. Reviewer 2's scores were found to be evenly distributed and statistically consistent, and thus applied fairly among all applicants.

We also reject as baseless Green Leaf's argument that Reviewer 2's scores give the appearance of impropriety or possible conflict of interest.

A-0783-21

Any remaining arguments raised by appellants are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0783-21